POWERINE OIL COMPANY,
Plaintiff-Appellee,

v.

FEDERAL ENERGY ADMINISTRATION, an agency of the United States, et al., Defendants-Appellants.

No. 9–31.

Temporary Emergency Court of Appeals of the United States.

Argued May 10, 1976.

Decided May 28, 1976.

**380**

Marvin L. Coan, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., and Stanley D. Rose, Atty., Dept. of Justice, Washington, D. C., were on the brief for defendants-appellants.

Thomas J. McDermott, Jr., Kadison, Pfaelzer, Woodard, Quinn & Rossi, Los Angeles, Cal., with whom Richard S. Cohen and Richard T. Williams, Los Angeles, Cal., of the same firm, were on the brief for plaintiff-appellee.

Before CARTER, CHRISTENSEN and ESTES, Judges.

ESTES, Judge.

On September 16, 1975, plaintiff, Powerine, was denied exception relief by the Federal Energy Administration (FEA) from its July and August entitlements purchase obligations arising under 10 CFR § 211.67, which required payments to be made by Powerine during the months of September and October, 1975. Following the December 22, 1975 decision and order of the FEA denying Powerine's administrative appeal, it sought declaratory and injunctive relief in the United States District Court for the Central District of California. After a trial on the merits, the District Court found that the FEA had, in its denial of Powerine's administrative appeal, "unlawfully abused its discretion, acted in excess of its statutory authority and acted in an arbitrary and capricious manner." *Powerine v. F.E.A.* (CD Ca.Dkt. CV–75–4330–R, Feb. 23, 1976), 3 CCH Energy Management ¶ 26,041 at p. 26,345.[1]

On February 23, 1976, the district court issued a permanent injunction which restrained the FEA from requiring Powerine to make October entitlement purchases or pay any civil and/or criminal penalties for failure to do so, and further ordered that the FEA's December 22, 1975 decision and order be vacated and the matter remanded to the agency for further administrative proceedings consistent with the court's opinion.[2] Defendants, FEA, Frank G. Zarb, Administrator of the FEA, and the United States of America, bring this appeal from the district court's judgment.

The Entitlements Program, 10 CFR § 211.67, was promulgated by the FEA on November 29, 1974, 39 F.R. 42,246 (Dec. 4, 1974). Under Special Rule No. 3, which allowed small refiners to be phased into the program on a gradual basis, Powerine's entitlement purchases for the first three months of the program were less than $40,-

---

1. As explained in *Pasco, Inc. v. FEA,* 525 F.2d 1391, 1393 n. 4 (Em.App.1975), entitlement purchase obligations accrue on the basis of the crude oil runs to stills made by the refiner two months previously. Thus the purchase obligations of Powerine for September and October, 1975, were based on Powerine's crude oil runs to stills for the months of July and August, 1975. For a complete description of the background and technical operation of the Entitlements Program see *Pasco, Inc. v. FEA, supra,* 525 F.2d at 1393, 1396.

2. Powerine was a seller of entitlements during November and December, 1975, totaling

$1,212,280.70. Section 403(a) of the Energy Policy and Conservation Act (Energy Policy Act), P.L. 94–163 (December 22, 1975), amends and adds to section 4 of the Allocation Act, subsection (e), which implemented by Special Rule No. 6, 41 F.R. 1043–1046 (January 6, 1976), exempts Powerine from any entitlement purchases for the first 50,000 barrels per day of input or receipts in any month beginning with December, 1975, so long as its total refinery capacity does not exceed 100,000 barrels per day. Powerine's total refinery capacity, from October, 1974 to present, has been 46,000 barrels per day.

000 per month.[3] Powerine filed an application for an exception from the program on March 17, 1975 and was granted complete relief from the program from April 1, 1975 through June 30, 1975. *Powerine Oil Company,* Case No. FEE–1489 (filed 3–17–75, decided 3–28–75), 1975 CCH Energy Management Transfer Binder ¶ 83,096. A second exception application was granted to Powerine by the FEA to relieve the company of all entitlement purchase obligations for the period of July 1, 1975 through August 31, 1975. *Powerine Oil Company,* Case No. FEE–1715 (filed 5–30–75, decided 7–9–75), 1975 CCH Energy Management Transfer Binder ¶ 83,220.

On July 31, 1975, Powerine filed its exception application for an extension of the relief granted by the FEA in its July 9 Decision. Concluding that Powerine failed to demonstrate that the application of the program to it would result in a serious hardship or gross inequity, the FEA denied Powerine's application.[4] *Powerine Oil Company,* Case No. FEE–1842 (filed 7–31–75, decided 9–16–75), 1975 CCH Energy Management Transfer Binder ¶ 83,292. Powerine's request for a stay of its September entitlement purchase obligations was denied by the FEA on October 3, 1975.[5] *Powerine Oil Company,* Case No. FES–0604

(filed 9–24–75, decided 10–3–75), 1975 CCH Energy Management Transfer Binder ¶ 85,-055. An administrative appeal was filed with the FEA by Powerine, October 17, 1975. Powerine applied for a stay of its October entitlement purchase obligations pending its administrative appeal, which was also denied.[6] *Powerine Oil Company,* Case No. FES–0633 (filed 10–23–75, decided 11–6–75), 1975 CCH Energy Management Transfer Binder ¶ 85,069.

Having obtained no relief from the FEA for its October purchase obligations, and believing itself entitled to relief based upon the new data submitted in its appeal, Powerine brought suit in the United States District Court for the Central District of California on October 31, 1975 for injunctive relief to enjoin the enforcement by the FEA of the entitlements program against it. *Powerine Oil Company v. FEA* (CD Ca.Dkt. CV–75–3661–R). A temporary restraining order was issued by that court on November 3, 1975, a preliminary injunction was issued December 3, 1975, and a permanent injunction was issued on December 19, 1975 which enjoined the enforcement of Powerine's October purchase obligations until 14 days after the FEA issued its decision on Powerine's pending administrative appeal. The appeal was denied by the FEA on December 22, 1975.[7] *Powerine Oil Com-*

3. Powerine is a small and independent refiner within the meaning of "small refiner" as defined in section 3(4) of the Allocation Act, 15 U.S.C. § 752(4) (1976 Supp.), and within the meaning of "independent refiner" as defined in section 3(3) of the Allocation Act, 15 U.S.C. § 752(3) (1976 Supp.).

4. The FEA analyzed Powerine's application in accordance with the criteria set forth in *Delta Refining Co.,* Case No. FEE–1854 (filed 8–1–75, decided 9–11–75), 1975 CCH Energy Management Transfer Binder ¶ 83,275, and determined that based on Powerine's own projections for the six-month period ending January 31, 1976, and assuming the purchase by Powerine of entitlements during the period September, 1975 through January, 1976, at a total cost of $3,742,500, the firm's profit margin for its 1976 fiscal year would still exceed its historic profit margin, and thus further analysis of Powerine's projected return on invested capital was unnecessary.

5. Powerine's entitlement purchase obligations for the month of September totaled $830,-

121.78. 40 F.R. 43948 (Sept. 24, 1975). These purchases were completed by October 7, 1975, under a special arrangement whereby the seller would return the purchase money to Powerine in the event it was subsequently determined, administratively or judicially, that Powerine was not under an obligation to purchase such entitlements.

6. For the month of October, Powerine was obligated to purchase 178,357 entitlements at $8.31 each for a total obligation of $1,482,163.20. 40 F.R. 48714 (Oct. 17, 1975).

7. Powerine premised its appeal on the changes in its actual and projected results for the third and fourth quarters of its 1976 fiscal year. Powerine's new data indicated that these changes occurred primarily because of Powerine's increased crude oil and raw material costs. While Powerine's projections in its appeal submission indicated the firm would qualify for relief under the standards of *Delta Refining Co.,* Case No. FEE–1854 (filed 8–1–75, decided 9–11–75), 1975 CCH Energy Management

*pany,* Case No. FEA–0633 (filed 10–17–75, decided 12–22–75, 4 CCH Energy Management ¶ 80,537.

On December 31, 1975, the complaint in this case was filed with the district court challenging the decision of the FEA denying Powerine's appeal. A stay Order was issued by the court, enjoining enforcement of Powerine's entitlement purchase obligations pending a trial on the merits. The district court, on February 23, 1976, entered its order enjoining enforcement of the program as to Powerine and remanding the matter to the agency for a redetermination of the appeal based on the standards of review set forth by the agency in two other exception cases.[8] A motion for a stay of this order filed by the FEA was denied by the district court on March 10, 1976. The FEA gave notice of appeal on March 3, 1976. On March 15, 1976, Chief Judge Tamm denied FEA's motion for a stay filed with this court.

The procedures for applying for an exception from an FEA regulation "based on an assertion of serious hardship or gross inequity" are set forth at 10 CFR § 205 Subpart D. In considering exception applications from the Entitlements Program pursuant to this subpart, the FEA initially granted relief in cases where such was necessary to enable a firm to operate consistently with its historical level of operations and achieve its historic profit margin. In a published notice of August 4, 1975, 40 F.R. 33,489

(Aug. 8, 1975), and in *Delta Refining Co.,* Case No. FEE–1854 (filed 8–1–75, decided 9–11–75), 1975 CCH Energy Management Transfer Binder ¶ 83,275, the FEA announced new criteria which it would thereafter apply to exception applications under the Entitlements Program. Under these standards, exception relief is generally granted where a firm, by reason of the impact of the Entitlements Program, would be unable to realize the lesser of its historic profit margin or the arithmetic average of the return on invested capital which it realized during the best four of the seven previous fiscal years.

In the instant case, Powerine contended and the district court found that the FEA failed to use the *Delta* standards in its review on appeal of the September 16, 1975 decision and order denying Powerine exception relief, and that Powerine was therefore treated in an inconsistent and hence an arbitrary and capricious manner. We agree with the FEA that the district court erred in determining that the FEA's December 22, 1975 decision and order denying Powerine exception relief was inconsistent with its decision in *Fletcher Oil and Refining Company,* Case Nos. FEA–0619 and FEE–1964 (filed 10–20–75 and 10–10–75, decided 11–11–75), 4 CCH Energy Management ¶ 80,504. In *Fletcher,* the *Delta* criteria were used in considering that appeal after Fletcher's data met the FEA's "gross disparity" and "irreparable injury" requirements.[9]

---

Transfer Binder ¶ 83,275, the FEA denied Powerine's appeal, as exception relief is by its nature short-term relief and the firm failed to show on its appeal that it would be irreparably harmed by full compliance with its entitlement purchase obligations or that "the firm's continued viability [would] be immediately impaired by its obligations under the Entitlements Program." *Powerine Oil Company,* Case No. FEA–0633 (filed 10–17–75, decided 12–22–75), 4 CCH Energy Management ¶ 80,537 at p. 80,-660.

8. The district court remanded the case to the agency for application of the criteria set forth in *Delta Refining Co.,* Case No. FEE–1854 (filed 8–1–75, decided 9–11–75), 1975 CCH Energy Management Transfer Binder ¶ 83,275, to Powerine's submission on appeal and "if appropriate," for the granting of relief similar to

that granted in *Fletcher Oil and Refining Company,* Case Nos. FEA–0619 and FEE–1964 (filed 10–20–75 and 10–10–75, decided 11–11–75), 4 CCH Energy Management ¶ 80,504.

9. Under 10 CFR § 205.106(b)(2), the FEA can deny any appeal where the appellant fails to establish that:

    (i) the appeal was filed by a person aggrieved by an FEA action;

    (ii) the FEA's action was erroneous in fact or in law; or

    (iii) the FEA's action was arbitrary or capricious.

The FEA considers exception applications on a quarterly basis in order to accommodate the changing aspects of individual oil companies' financial projections. It would, as the FEA has recognized, be an "insuperable administrative"

The FEA also asserts that the relief sought by Powerine is retroactive and as such it is granted only in cases where serious and irreparable injury will otherwise result.[10] In its consideration and denial of Powerine's appeal, the FEA found that even with Powerine's adjusted financial projections, Powerine simply did not meet the irreparable injury test and thus the reevaluation of the new data under the *Delta* criteria was not necessary.[11] And Powerine conceded at argument that it had made no showing in the district court of irreparable injury.

Under section 7(i)(1)(D) of the Federal Energy Administration Act of 1974, 15 U.S.C. § 766(i)(1)(D) (1976 Supp.), adjustments are to be made by the agency "consistent with the other purposes of this Act, as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens" under the Act. The FEA accepts applications for exceptions from the entitlements program under 10 CFR § 205 Subpart D and, wherever warranted, generally grants exception relief on a quarterly basis.[12] This method of calculating necessary relief every three months provides the FEA with sufficient data on which to base necessary financial projections and allows refiners an opportunity on a periodic basis to update their financial projections based on actual operating results as such figures become available.[13] Thus, by requiring the reapplication for exception relief every three months, the FEA can be sure that the recipients of such are genuinely faced with special hardships and that no one firm may be faced with an unfair share of the burdens of the Entitlements Program beyond a three-month period.

In the event a party believes the FEA has reached an erroneous decision, in fact or in law, with regard to its exception applica-

task to grant revised exception relief on the basis of short-term changes in a firm's financial status.

Thus, as a general rule, the FEA will not alter decisions which it has issued unless a showing is made that subsequent events have affected in a very significant manner the assumptions and projections utilized in analyzing the exception application and that as a result there is a gross disparity between those projections and the revised projections which now appear to be more reasonable. . . . In cases where a gross disparity has been found to exist and where the revised projections would have a substantial impact on the relief approved, the FEA has generally granted additional exception relief on a prospective basis.

*Powerine Oil Company,* Case No. FEA–0633 (filed 10–17–75, decided 12–22–75), 4 CCH Energy Management ¶ 80,537 at p. 80,659. The FEA, in denying Powerine's appeal, also stated that an annual review would be provided for Powerine when its actual operating results became available at the end of its 1976 fiscal year, on January 31, 1976. *Powerine Oil Company, supra,* 4 CCH Energy Management ¶ 80,-537 at p. 80,661.

**10.** The FEA's Reply Brief, footnote 8, explains that

Retroactive relief relieves a refiner from its entitlements purchase obligation contained in a previously published entitlement list. In the case of Powerine's July obligation, which it has already completed (although in untimely fashion), retroactive relief would make the

firm whole for the money it expended to purchase entitlements. Where a firm . . . has failed to make purchases, as is Powerine's situation with respect to August obligations, retroactive relief would have the effect of eliminating the published obligation. Thus, whether or not the refiner already has purchased entitlements for the previous month, the purpose of the relief is to remove its obligation from the list.

Whether the hardship-inequity exception relief provided for in the controlling statutes and regulations, as applied by FEA, be retroactive or prospective does not control the determination of this case. The FEA may and now does use future entitlement lists rather than altering past months' entitlement lists in granting exception relief. This has been found to be a practical means for making proper adjustments.

**11.** The FEA in its order indicated that irreparable harm must be shown to be the result absent relief from the Program, in order to qualify for relief on an appeal, and Powerine failed to make any showing of irreparable harm.

**12.** This court recognized the reasonableness of granting exceptions on a quarterly basis in *Pasco, Inc. v. FEA,* 525 F.2d 1391, 1403 n. 22 (Em.App.1975).

**13.** In this case, during the pendency of its appeal, Powerine submitted the actual results for its first three quarters of its 1976 fiscal year and its projections for the fourth quarter.

tion, or where the financial circumstances of the firm have changed so substantially since the filing of its exception application that its actual continued economic viability and existence is threatened by the operation of the Entitlements Program, an appeal of the FEA exception decision may be filed with the FEA under the provisions of 10 CFR § 205 Subpart H. However, in the determination of the appeal the FEA is not, and could not be, limited to the standards utilized for granting initial exception relief. To require such would result in an appeal from every denial by the agency of exception relief, whether meritorious or not. The FEA already has an enormous administrative task, which this court has previously recognized,[14] and the courts must not seek to expand the limits imposed by the agency on its own standards for appellate review, where such are rationally related to the administrative task delegated to the agency.

In drafting the Allocation Act, Congress was fully aware of the complexities of the petroleum industry, stating, "Administrative flexibility is a prerequisite and, consequently, the Committee has decided to recommend that the Executive be assigned the responsibility for crafting the program pursuant to congressionally defined (though generally stated) objectives." H.R. No. 93–531, 93rd Cong. 1st Sess., U.S.Code Cong. & Ad.News, pp. 2582, 2589 (1973). This administrative flexibility was incorporated into the mandated attainment of the Congressional objectives by the qualification that they be attained "to the maximum extent practicable." 15 U.S.C. § 753(b)(1). Congress directed, under the Allocation Act, that adjustments were to be made by the President in the mandatory allocation program "as . . . may reasonably be necessary. . . ." 15 U.S.C. § 753(c)(3), (4).

The determination of criteria for making adjustments or granting exception relief was left by Congress to the President, and by him to the agency administering the Act. Congress specified no tests or standards to be followed in such cases; rather, the agency was to provide an avenue for application for relief and, upon a denial of relief, the availability of administrative appellate review.

■ In this case, the FEA applied the *Delta* criteria to Powerine's exception application and found no exception relief to be necessary, inasmuch as in the absence of relief Powerine's profit margin for the fiscal year 1976 would still exceed its historical average profit margin. Powerine submitted new figures on appeal showing that its circumstances had substantially changed from the assumptions set forth in its exception application.[15] While the difference between its original submission and its projections submitted on appeal may have represented a gross disparity, and have qualified under the *Delta* standards for exception relief, the FEA did not reach these tests, since Powerine made no showing that it would suffer any irreparable harm if it were not given exception relief as a result of its appeal. This obviously represents a more stringent evaluation by the FEA; however, Powerine was entitled to submit further exception applications which would be evaluated according to the *Delta* standards for serious hardship. The fact that its appeal submission had to show the firm was faced with irreparable harm and that a gross disparity existed between the original projections and its appeal submissions before the FEA would apply the *Delta* standard for exception relief, was not at all irrational, arbitrary, capricious, or beyond the authority of the agency.

14. See *Pasco, Inc. v. FEA*, 525 F.2d 1391, 1394 (Em.App.1975); *Condor Operating Company v. Sawhill*, 514 F.2d 351, 359 (Em.App.1975), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975).

15. The new data submitted on appeal indicated that the actual cost of raw materials for Powerine's third-quarter operations and projected costs of raw materials for its fourth-quarter operations were considerably higher than originally projected by Powerine in its exception application; that these increased costs resulted in a 77% decrease in projected profits for the 1976 fiscal year; and that Powerine's projected profit margin was then below its historic average profit margin.

■ As this court stated in *Reeves v. Simon,* 507 F.2d 455, 460 (Em.App.1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975):

This court has recognized a strong presumption in favor of administrative decisions by those agencies charged with immediate administration of a new federal statute. *See University of Southern California v. Cost of Living Council,* 472 F.2d 1065, 1068–1069 (Em.App.1972); *Pacific Coast Meat Job. Ass'n v. Cost of Living Council,* 481 F.2d 1388, 1391–1392 (TECA 1973); *Mandel v. Simon,* 493 F.2d 1239, 1240 (TECA 1974).

Further, the judicial review of an agency's interpretation of a statute and regulations promulgated pursuant thereto is a limited one. As this court stated in *Pasco, Inc. v. FEA,* 525 F.2d 1391, 1400–1404 (Em.App. 1975):

It was the duty of the FEA to enact regulations consistent with a proper interpretation of the Allocation Act's objectives and, having done so, to determine the question of the application or non-application of such regulations to companies which are within the purview of the Act. In reviewing the discharge of an agency's function in interpreting the Act, promulgating regulations thereunder and applying and enforcing such regulations, this court has recognized that where administrative control has been congressionally authorized, the "judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." *Pacific Coast Meat Job. Ass'n, Inc. v. Cost of Living Coun.,* 481 F.2d 1388, 1391 (TECA 1973), which was quoting from *Miss. Valley Barge Co. v. United States,* 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed.

1260 (1934). See also *Condor Operating Co. v. Sawhill, supra,* 514 F.2d 351 (TECA 1975), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975); *Reeves v. Simon,* 507 F.2d 455, 460 (TECA 1974); *cert. denied,* 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975); *Mandel v. Simon,* 493 F.2d 1239, 1240 (TECA 1974); *University of Southern California v. Cost of Living Council,* 472 F.2d 1065, 1068–1069 (TECA 1972), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973).

This basic principle of deference was reiterated in *Cities Service v. FEA,* 529 F.2d 1016, 1026 n. 16 (Em.App.1975), wherein this court quoted from the statement of the Supreme Court in *Railroad Com. v. Rowan & Nichols Oil Co.,* 310 U.S. 573, 580–584, 60 S.Ct. 1021, 1024, 84 L.Ed. 1368, 1373–1374 (1940), which held that:

[S]uch cases are only episodes in the evolution of adjustment among private interests and in the reconciliation of all these private interests with the underlying public interest in such a vital source of energy for our day as oil. Certainly so far as the federal courts are concerned the evolution of these formulas belongs to the Commission and not to the judiciary. A controversy like this always calls for fresh reminder that courts must not substitute their notions of expediency and fairness for those which have guided the agencies to whom the formulation and execution of policy have been entrusted. . . . It is not for the federal courts to supplant the Commission's judgment even in the face of convincing proof that a different result would have been better.[16]

■ The necessity of making "rough accommodations" to implement and effective-

---

**16.** In *Cities Service v. FEA,* 529 F.2d 1016, 1025 (Em.App.1975), this court held that the entitlements regulation "is a rational response to the changing conditions under which the objectives of section 4(b) must be read, and . . . the regulation is not arbitrary, capricious, or an abuse of administrative discretion." While the challenge to the regulation in *Cities Service v. FEA, supra,* was by a major integrated oil company, the regulation was also upheld in re-

sponse to the contentions of a small refiner in *Pasco, Inc. v. FEA,* 525 F.2d 1391, 1401 (Em. App.1975), where this court stated:

The inclusion of small refiners as a class . . . in the entitlements regulation, with its exception process for hardship cases, is a valid, rational exercise of the agency's authority under the Act and within relevant expressions of Congressional intent.

ly administer the "complex program necessary to deal with the petroleum industry" has warranted "special attention" by this court to the rule of deference when it is faced with reviewing agency action which grants or denies exception relief to parties based on a case-by-case determination of the effect of the application of agency regulations to that party. *Pasco, Inc. v. FEA, supra,* 525 F.2d at 1404. It was emphasized in *Pasco, Inc. v. FEA, supra,* 525 F.2d at 1404, that

> Administrative decisions based upon analysis of the data and information submitted on applications for exception relief require the application of administrative expertise, and this court should not be quick to overturn them. In *Consumers Union of U. S., Inc. v. Cost of Living Council,* 491 F.2d 1396, 1403 n. 2 (TECA 1974), *cert. denied,* 416 U.S. 984 [94 S.Ct. 2387, 40 L.Ed.2d 761] (1974), this court quoted from *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161 [25 L.Ed.2d 491] (1970), which stated: "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific."

■ The December 22, 1975 order of the FEA denying Powerine's appeal from the decision and order of September 16, 1975, which denied Powerine exception relief, was clearly within the FEA's authority. As noted in *Pasco, Inc. v. FEA, supra,* 525 F.2d at 1397, the small refiners purchase approximately 25 per cent of the entitlements issued under the program and, despite Powerine's contentions to the contrary, Congress did not intend the FEA to totally insulate or protect small and independent refiners from every regulation which would impose financial burdens on firms in the petroleum industry.[17] The Allocation Act

includes, among others, the objective of preserving

> an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent marketers, refiners, small refiners, nonbranded independent marketers, and branded independent marketers; . . .

Section 4(b)(1)(D), 15 U.S.C. § 753(b)(1)(D) (1976 Supp.). However, as stated in *Pasco, Inc. v. FEA, supra,* 525 F.2d at 1397:

> This court has previously recognized that none of the nine objectives of the Act should be elevated to the level of a mandatory duty and that "the balancing of all objectives is required 'to effectuate maximum achievements of their competing interests.'" *Air Transport Association of America, Trans World Airlines, Inc. v. F. E. O., et al.,* 520 F.2d 1339 (TECA 1975); *Consumers Union v. Sawhill,* 525 F.2d 1068, rehearing en banc, vacating 514 F.2d 1112 (TECA 1975).

Powerine has received special administrative exception relief from a great portion of its obligations under the entitlements regulation; was a seller of entitlements during November and December of 1975; and is now, until rulemaking by the FEA to the contrary, exempt from any purchase obligations under section 4(e) of the Allocation Act, as amended by the Energy Policy and Conservation Act, P.L. 94–163, Dec. 22, 1975, thus receiving considerable benefit from the program which they wish to be excepted from supporting. We must repeat our statement from *Pasco, Inc. v. FEA, supra,* 525 F.2d at 1400, that "[Powerine], a profitable [refiner-marketer] operating in the petroleum industry, must accept its fair and equitable share of the burden as well as

---

17. Congress recognized that certain small refiners could be subject to substantial competitive disadvantages in competing for crude oil supplies with the larger refiners. To fulfill the Congressionally defined objective of maintaining the competitive viability of small refiners, Congress expressly indicated its intent to pro-

vide small refiners "a mantle of protection" by singling them out under the Allocation Act; however, no exemption was granted small refiners as a class. H.R.Conf.Rep.No.93–628, U.S.Code Cong. & Ad.News, 93d Cong., 1st Sess. pp. 2688, 2693 (1973).

the benefits of the programs implementing the Allocation Act which the national energy crisis necessitated."

■■■■ The burden of proof before the agency and the district court was upon the plaintiff, Powerine, to establish that the FEA order of December 22, 1975, was in excess of the agency's authority or based upon findings which are not supported by substantial evidence.[18] There was substantial evidence before the FEA on which it could determine in its September 16, 1975 decision and order that Powerine was not entitled to any exception relief at that time. And when, as here, an appeal is based on new evidence or changed circumstances, the FEA's requirement of a more convincing showing of necessity for relief is a rational administrative determination, considering the complex nature and practical necessity of the Entitlements Program's operation and the frequent review granted applicants in the normal course of agency administration.

The FEA properly found Powerine had not met its burden before the agency, and denied Powerine's appeal. The action, decision and order of the FEA under attack were authorized by law, supported by substantial evidence, and were not arbitrary, capricious, erroneous, or otherwise unlawful. The judgment of the district court is reversed and remanded with instructions to dismiss Powerine's action on the merits, and to proceed expeditiously to appropriate disposition of the counterclaim of the United States consistent with this opinion.

SO ORDERED.

■■■■

18. Section 211(d)(1) and (e)(1) of the Economic Stabilization Act of 1970, as amended (ESA), 12 U.S.C. § 1904 note (1976 Supp.), was adopted by § 5 of the Emergency Petroleum Allocation Act of 1973, as amended, 15 U.S.C. § 754 (1976 Supp.), and by § 5 of the Emergency Petroleum Allocation Act of 1973, as amended by §§ 452 and 461 of the Energy Policy and Conservation Act, P.L. 94–163, Dec. 22, 1975, 2 CCH Energy Management ¶ 10,850.

Quoting from *Condor Operating Company v. Sawhill,* 514 F.2d 351, 359 (Em.App.1975), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975), this court, in *Pasco, Inc. v. FEA,* 525 F.2d 1391, 1401 (Em.App.1975), said, " 'The party attacking a regulatory scheme must carry the burden of persuasion.' *Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); *American Nursing Home Ass'n v. Cost of Living Council,* 497 F.2d 909 (Em.App. 1974)."