DELTA REFINING COMPANY, Plaintiff-Appellant and Cross-Appellee,

v.

FEDERAL ENERGY ADMINISTRATION et al., Defendants-Appellees and Cross-Appellant.

No. 76–2267.

Temporary Emergency Court of Appeals.

Argued May 20, 1977.

Decided July 19, 1977.

Gerald M. Stern, Rogovin, Stern & Huge, Washington, D. C., with whom George T. Frampton, Jr., Washington, D. C., was on the brief for appellant.

Marvin L. Coan, Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., and Stanley D. Rose, Washington, D. C., were on the brief for appellees.

Before CHRISTENSEN, JAMESON and GRANT, Judges.

GRANT, Judge.

These consolidated appeals arising from a single district court judgment present two issues for review:

DC–44. Whether the district court erred in holding that the Federal Energy Administration (FEA) acted within its statutory and regulatory authority in conducting a 1975 year-end review and adjustment of exception relief from the Entitlements Program (10 C.F.R. § 211.67) which had previously been granted Delta Refining Company (Delta); and that Delta had adequate notice thereof. For reasons hereinafter stated, we hold that FEA did have and does have statutory authority to conduct such year-end review and, further, that Delta was given adequate notice that the relief granted during the course of 1975 was conditional or provisional in nature. We affirm in DC–44.

DC–43. Whether the district court erred in holding that FEA's upward adjustment of Delta's 1975 pre-tax income to offset a company change in method of inventory valuation from the First In/First Out (FIFO) basis to the Last In/First Out (LIFO) basis for the purpose of determining final 1975 exception relief from the Entitlements Program was improper and not supported by substantial evidence. For the reasons hereinafter stated, we also affirm the holding of the district court in DC–43.

## DC–44

In January 1974, pursuant to authority granted it by the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 *et seq.*, the Federal Energy Office (FEO) issued comprehensive regulations to control the allocation and price of crude oil (10 C.F.R. §§ 210–211 (1974)). These regula-

tions instituted a "two-tiered" system whereby a low price was imposed on "old" crude oil but "new" crude oil (newly discovered oil and oil produced above 1972 production levels from the same property) was exempted from controls.

In December 1974, to ameliorate the competitive disadvantages among refiners caused by the two-tiered pricing system and by unequal access by refiners to price-controlled "old" oil, FEO's successor, the Federal Energy Administration (FEA), promulgated the Old Oil Entitlements Program. (39 F.R. 42246, December 4, 1974.) As the FEA defines its program:

"The Entitlements Program is designed to remedy the economic distortion created by an unequal distribution of low cost, price controlled old crude oil among domestic refiners, and is implemented by the issuance each month of entitlements to each domestic refiner on the basis of each refiner's volume of crude oil runs to stills. An entitlement is defined as the right of a refiner owning the entitlement to include one barrel of old oil in its adjusted crude oil receipts in a particular month. (10 C.F.R. 211.63.) Under the program, a refiner is issued a sufficient number of entitlements to assure it an old oil supply ratio equal to the adjusted national old oil supply ratio.

"A refiner which has old oil receipts in excess of its entitlements in a particular month is required to purchase a number of entitlements equal to that excess amount. Similarly, a refiner with a number of old oil receipts which is less than the number of its entitlements in a particular month is required to sell those excess entitlements. The price at which entitlements must be sold is fixed each month by the FEA."[1]

Under the Entitlements Program, small refiners (those having a capacity of less than 175,000 barrels per day) which met

---

1. Quoted from the March 28, 1975, Decision and Order of the FEA rendered on Delta's original Application for Exception from the Entitlements Program. FEA Case FEE–1444. A more complete description of the Entitlements Program and its regulatory purpose has been set forth by this Court in earlier decisions. *See Pasco, Inc. v. FEA*, 525 F.2d 1391 (Em.App. 1975) and *Cities Service Co. v. FEA*, 529 F.2d 1016 (Em.App.1975), *cert. denied*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976).

certain prescribed standards, are eligible for exceptions relief from entitlement obligations. Timely application must be made for such exception relief, and the propriety of granting it is based on the applicant's own financial projections to FEA, which financial data must establish the serious hardship or gross inequity of which the applicant complains. That data includes the applicant's financial statements for the seven years prior to 1975 and, also, its anticipated entitlement purchases for the months ahead. In cases where these projections indicate that the applicant would not achieve its "historic profit margin",[2] short-term (three months) exceptions relief was deemed appropriate. At the end of each three months, refiners are required to update their previous projections and to submit new projections for the months ahead.

Plaintiff Delta applied for, and on March 28, 1975, received from FEA an exception from purchasing 90% of the entitlements it would otherwise have been required to purchase through June 1975. FEA later extended this exceptions relief to include the additional months of July and August 1975 but denied exceptions relief for the months that followed.

The Decision and Order of March 28, 1975, (*Delta Refining Co.*, 2 FEA, see 83,078 at 83,233), granting exception relief to Delta, gave notice of its potentially conditional character. It contained the following language:

> This exception is based upon the presumed validity of statements, allegations and documentary material submitted by the applicant. It may be revoked or modified at any time upon a determination that the factual basis underlying the exception application is incorrect. In considering standards governing the extent to which the relief granted by this Order shall be extended, the FEA shall consider

the accuracy and validity of the materials accompanying the firm's original application for exception. Furthermore, *the FEA may, by Order, direct appropriate adjustments or remedial action by Delta to the extent that the firm's operating results and financial projections are demonstrated to have been materially inaccurate by the firm's actual sales revenue and actual operating experience.* (Emphasis added.)

Additionally, in certain individual published Decisions and Orders, *Navajo Refining Co.*, 2 FEA ¶ 80,285 (September 18, 1975); *Powerine Oil Co.*, 3 FEA ¶ 80,537 (December 22, 1975); *Famariss Oil Corp.*, 3 FEA ¶ 80,540 (January 2, 1976); and *Navajo Refining Co.*, 3 FEA ¶ 80,561 (January 26, 1976), FEA gave specific notification, of general applicability to all small refiner recipients, that a 1975 year-end review of exception relief would be conducted. In *Navajo, supra*, issued on September 18, 1975, the agency stated:

> . . . [I]n view of the protected status of small and independent refiners under the Emergency Petroleum Allocation Act of 1973, the varying NOOSR's [National Old Oil Supply Ratio], entitlements prices and other factors, the FEA will make a *further assessment* of the manner in which the Entitlements Program has affected *all small refiners* after a sufficient period of time has elapsed. In Navajo's case, once final operating data is received for the twelve-month period ending January 31, 1976, the FEA intends to review whether additional exception relief is appropriate for that twelve-month period. *The FEA will then reconsider the impact on each firm that has previously been granted or denied full exception relief and will take any appropriate corrective action.* 2 FEA ¶ 83,285 at 83,937. (Emphasis added.)

---

**2.** The exception relief was generally designed to alleviate the adverse impact of the Entitlements Program which would otherwise prevent a firm from achieving the lesser of its historic profit margin or historic return on invested capital during the four fiscal quarters corresponding most closely to the 1975 calendar year. *Delta Refining Co.*, 2 FEA ¶ 83,275 (September 11, 1975). The proper application of this standard, often referred to as the *Delta* standard, was previously considered by this Court in *Powerine Oil Co. v. FEA*, 536 F.2d 378 (1976).

On April 23, 1976, FEA sent a telegram to Delta notifying the firm that it was undertaking a review of the exception relief granted the company throughout 1975 and requesting it to submit detailed financial statements setting forth its actual operating results for the year in order to permit the agency to determine whether the level of relief which had been extended to the firm was appropriate. Similar telegrams were sent to other small refiners which had received entitlement benefits during 1975.

After the submission of final data by small refiners, the FEA published a notice, entitled "Proposed Adjustments to 1975" (41 F.R. 36540, August 30, 1976), which explained the proposed 1975 year-end review and set forth the preliminary results of FEA's calculation of adjustments to the exception position of Delta and other affected firms. Delta was listed as owing the program, in excessive entitlements relief, $4,559,585. At the same time, a work-sheet was mailed to each firm detailing the computation of the proposed additional entitlement obligation or benefit for 1975. To arrive at its proposed adjustments, FEA reviewed the audited data submitted by the small refiners and, in certain circumstances, adjusted the data. The results were then measured against the applicable criteria to determine whether and, if so, how much of a serious hardship was incurred as the result of the operation of the Entitlements Program. On the basis of its review of Delta's audited data, as adjusted, which showed the firm to be in substantially better financial position than projections submitted to FEA in the early part of 1975 had indicated, FEA determined that Delta had not actually experienced the serious hardship for which the exceptions relief had been granted and consequently owed the program for distribution to other refiner participants, in excessive entitlements relief, a refund of $4,559,585.

Following opportunity for submission of written comments, FEA issued a Supple-

mental Order, Beacon Oil Co., 35 al., 4 FEA ¶ 87,024 (November 5, 1976), to all small refiners containing final adjustment amounts, along with a work-sheet and, in addition, individual letters to those firms, including Delta, which had raised arguments in their comments that related only to the particular firm. That Order required Delta to re-pay the amount previously proposed—through entitlements purchases spread over a twelve-month period.

Delta timely filed its administrative appeal which was denied by FEA in its Decision and Order dated January 26, 1977. Delta then filed this action seeking injunctive relief in the United States District Court for the District of Columbia. The matter was heard by the district court on an expedited basis. Cross-motions for summary judgment were argued and on February 22, 1977, the district court issued its Memorandum Opinion and Order granting in part and denying in part each summary judgment motion. The Government thereupon filed its Notice of Appeal in this court in DC–43 and Delta filed its cross-appeal in DC–44.

In its Amended Complaint, Delta contended that FEA lacked specific statutory authority to embark on what it describes as a "unique retroactive recapture program" and, further, that FEA had not properly exercised any inherent authority it did possess because it had failed to promulgate regulations to cover such action as "the statute requires".[3]

FEA, on the other hand, contends that the 1975 year-end review and adjustment of exception relief was within the agency's statutory authority and, further, was premised on proper and adequate notice to the Company.

Section 7(i)(1)(D) of the Federal Energy Administration Act of 1974 as amended (15 U.S.C. § 761 et seq., Supp. V, 1975) provides the authority for the exceptions and appeals process here involved. That section directs that the agency (FEA)

---

**3.** Delta's further allegation concerning FEA's treatment of its changeover from FIFO to LIFO method of accounting for inventory valuation

purposes will be considered hereinafter under DC–43.

. . . [s]hall provide for the making of such adjustments, consistent with the other purposes of this Act, as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens *and* shall, by rule, establish procedures which are available to any person for the purpose of seeking an interpretation, modification, recision of, exception to, or exemption from, such rules, regulations, and orders.[4] (Emphasis supplied.)

FEA has determined that Section 7(i)(1)(D) confers upon the agency the necessary flexibility to grant conditional relief on a short-term basis and then to make adjustments at year's end, if necessary, in order to effectuate the purpose of the relief. We begin this analysis with the well-settled proposition that "the interpretation of a statute by an implementing agency is entitled to great weight." *Fry v. United States*, 421 U.S. 542, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975); *Udall v. Tallman*, 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Pasco, Inc. v. FEA, supra; Pacific Coast Meat Jobbers Assn., Inc. v. Cost of Living Council*, 481 F.2d 1388 (Em.App. 1973); *Powerine Oil Co. v. FEA, supra*, 536 F.2d at 378, (Em.App.1976).

This court, in *Powerine, supra*, at 385, has previously considered the complex problems inherent in the administration of the Entitlements Program and made note of the "special attention" we must pay to the rule of deference in these cases. We stated there:

The necessity of making "rough accommodations" to implement and effectively administer the "complex program necessary to deal with the petroleum industry"

has warranted "special attention" by this court to the rule of deference when it is faced with reviewing agency action which grants or denies exception relief to parties based on a case-by-case determination of the effect of the application of agency regulations to that party. *Pasco, Inc. v. FEA*, supra, 525 F.2d at 1404. It was emphasized in *Pasco*, that

"Administrative decisions based upon analysis of the data and information submitted on applications for exception relief require the application of administrative expertise, and this court should not be quick to overturn them." (Citations omitted.)

Furthermore, in *Powerine* we held that Congress intended to allow FEA great flexibility in designing exceptions procedures and standards to carry out statutory requirements, and stated:

. . . The determination of criteria for making adjustments or granting exception relief was left by Congress to the President, and by him to the agency administering the Act. Congress specified no tests or standards to be followed in such cases; rather, the agency was to provide an avenue for application for relief and, upon a denial of relief, the availability of administrative appellate review.

■ Moreover, since the purpose of Section 7(i)(1)(D) is to prevent *actual* special hardship or inequity, which can be finally ascertained only after annual data has been collected and assessed, a year-end final adjustment on the basis of completed data and audited financial statements is unquestionably encompassed within the intent of the governing statutory provision. To hold

---

4. The complete section reads as follows:

"(D) Any officer or agency authorized to issue the rules, regulations, or orders described in paragraph (A) shall provide for the making of such adjustments, consistent with the other purposes of this chapter, as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens and shall, by rule, establish procedures which are available to any person for the purpose of seeking an interpretation, modification, recision of, exception to, or exemption from, such rules, regulations, and orders. If such person is aggrieved or adverse-

ly affected by the denial of a request for such action under the preceding sentence, he may request a review of such denial by the officer or agency and may obtain judicial review in accordance with paragraph (2) of this subsection when such denial becomes final. The officer or agency shall, by rule, establish appropriate procedures, including a hearing where deemed advisable by the officer or agency, for considering such requests for action under this paragraph." (Section 7(i)(1)(D) of the Federal Energy Administration Act of 1974, 15 U.S.C. 766(i)(1)(D).)

otherwise would defeat the very purpose of the governing statute. At year's end the agency would no longer be working with projections, but would be working with audited data. The district court here correctly pointed out the critical importance of this year-end review and adjustment in the following language:

. . . A year-end review, in conjunction with the interim quarterly reviews, was essential to ensure that firms not entitled to exceptions benefits were not allowed to retain such benefits. If the FEA had not conducted the 1975 year-end review, Delta (and other small refiners) would have attained a substantial financial and competitive advantage due to its relief from obligations which its year-end financial data showed it was not entitled to. Delta's position, if adopted by this Court, would make financial projections submitted on behalf of a small refiner seeking exceptions benefits controlling over the final, audited year-end data which indicate a firm's actual profits. To adopt Delta's position would be to undermine the fair administration of the Entitlements Program and would be contrary to Congressional intent.

D.D.C., Memorandum Opinion, February 22, 1977.

That year-end review and adjustment makes it possible for the agency to place all small refiners in the same position they would have occupied if the *actual* financial and operating results, which were subsequently achieved, could have been known at the time that the applications for exception relief were first submitted and acted upon. That year-end review and adjustment is in express compliance with the Congressional mandate that the agency

. . . [s]hall provide for the making of such adjustments, consistent with the other purposes of this Act, as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens

. . . . .

Section 7, FEAA, *supra.*

The power to grant that relief absolutely must, of necessity, include the power to grant it conditionally.

Delta contends that this court in *Powerine, supra,* denied retroactive exception relief and that that holding should be dispositive of the issue here. Powerine there had been denied exception relief on the basis of its financial projections. At the subsequent hearing on Powerine's administrative appeal:

Powerine submitted new figures . . . showing that its circumstances had substantially changed from the assumptions set forth in its exception application. While the difference between its original submission and its projections submitted on appeal may have represented a gross disparity, and have qualified under the *Delta* standards for exception relief, the FEA did not reach these tests, since Powerine made no showing that it would suffer any irreparable harm if it were not given exception relief as a result of its appeal.[5] This obviously represents a

---

**5.** Under 10 CFR § 205.106(b)(2), the FEA can deny any appeal where the appellant fails to establish that:

(i) the appeal was filed by a person aggrieved by an FEA action;

(ii) The FEA's action was erroneous in fact or in law; or

(iii) the FEA's action was arbitrary or capricious.

The FEA considers exception applications on a quarterly basis in order to accommodate the changing aspects of individual oil companies' financial projections. It would, as the FEA has recognized, be an "insuperable administrative" task to grant revised exception relief on the basis of short-term changes in a firm's financial status.

Thus, as a general rule, the FEA will not alter decisions which it has issued unless a showing is made that subsequent events have affected in a very significant manner the assumptions and projections utilized in analyzing the exception application and that as a result there is a gross disparity between those projections and the revised projections which now appear to be more reasonable. . . . In cases where a gross disparity has been found to exist and where the revised projections would have a substantial impact on the relief approved, the FEA has generally granted additional exception relief on a prospective basis.

*Powerine Oil Company,* Case No. FEA–0633 (filed 10/17/75, decided 12/22/75), 4 CCH Energy Management ⸢ 80,537 at p. 80,659. The

more stringent evaluation by the FEA; however, Powerine was entitled to submit further exception applications which would be evaluated according to the *Delta* standards for serious hardship. The fact that its appeal submission had to show the firm was faced with irreparable harm and that a gross disparity existed between the original projections and its appeal submissions before the FEA would apply the *Delta* standard for exception relief, was not at all irrational, arbitrary, capricious, or beyond the authority of the agency.

Powerine, *supra*, at p. 384.

It should be stressed here that the revised figures submitted by Powerine in its administrative appeal were still unaudited data and, further, that FEA in denying Powerine's administrative appeal, also *stated that an annual review would be provided for Powerine when its actual operating results became available at the end of its fiscal year.*

Delta further contends that Section 7(i)(1)(D) requires that FEA institute procedures by *regulations* for administering its program of adjustments. However, a careful reading of that section indicates clearly that it is a double-barreled mandate from the Congress to the administering agency to carry out two separate and distinct functions:

(1) "provide for the making of such adjustments . . . to prevent special hardship or unfair distribution of burdens" and (2) "shall, by rule, establish procedures which are available to any person for the purpose of seeking an interpretation, modification, recision of, exception to, or exemption from, such rules, regulations, and orders."

■ In holding that FEA has authority to fashion administrative relief in such a manner that exception relief granted at various intervals may subsequently be adjusted, the district court here stated:

. . . The Court has determined that the 1975 year-end review conducted in this instance was consistent with the agency's statutory and regulatory authority to administer the FEA Act of 1974, 15 U.S.C. § 761, *et seq.* Section 4(b)(1)(D) of the Allocation Act, 15 U.S.C. § 753(b)(1)(D); Section 7(i)(1)(D) of the FEA Act, 15 U.S.C. § 766(i)(1)(D); and the inherent authority of the FEA under the Act provide a broad grant of authority to the agency or its officers to administer the Act and to make such adjustments in exceptions relief as may be necessary. Moreover, the Courts have recognized the broad authority conferred upon the agency to administer its complex programs. See, *Powerine Oil Co. v. FEA*, 536 F.2d 378, 384 (Em.App.1976). Memorandum Opinion, February 22, 1977.

We agree with the district court.

■ We conclude that FEA had ample authority under Section 7(i)(1)(D) to conduct the 1975 year-end review and, further, that the regulations and procedures adopted pursuant thereto had provided Delta with adequate and reasonable notice of the conditional nature of the relief which had been advanced. For the reasons hereinabove expressed, we affirm the holding of the district court in DC–44.

## DC–43

During the Arab oil boycott of 1973–74 the price of crude oil, after many years of remaining relatively stable, began to climb very sharply. Many companies in the energy business—including Delta—took the prudent step of changing the method of determining cost-of-goods-sold during 1975 from the "first-in/first-out" (FIFO) method to the "last-in/first-out" (LIFO) method.

Use of the LIFO method is generally held to be preferable for firms that experience

---

FEA, in denying Powerine's appeal, also stated that an annual review would be provided for Powerine when its actual operating results became available at the end of its 1976 fiscal year, on January 31, 1976. *Powerine Oil Company, supra*, 4 CCH Energy Management ⸢ 80,537 at p. 80,661.

(This footnote is taken from Powerine, at pp. 382–3.)

substantial inflation in the cost of their raw materials being purchased rather than the cost of materials on hand or in inventory which had been purchased in earlier years at a much lower price. LIFO, therefore, more accurately reflects the company's *actual* current cost of operations.

"With use of the LIFO method, the reported cost of sales would continue to be a meaningful and realistic number matching current costs with current revenues and, consequently, no inflationary profits would be recognized." (Quoted from Coopers & Lybrand Opinion letter of September 20, 1976, Tr. p. 88.) Had Delta continued to use the FIFO method, the profit reflected on its books for fiscal 1975 would have been—in large part a false one, due to understated cost-of-goods-sold—a reflection of inflation and the aftermath of the Arab oil boycott rather than profits actually realized. This adjusted cost, based on the LIFO method, was used in calculating the 1975 profit which Delta reported to its stockholders, and to the Securities and Exchange Commission, and which it declared as taxable income to the Internal Revenue Service.

This change—from FIFO to LIFO—had the one-time effect of increasing Delta's cost-of-goods-sold during 1975 by $1.8 million. In its November 5, 1976, decision, FEA acknowledged that Delta's changeover from FIFO to LIFO—with its consequent $1.8 million change in Delta's financial report—was necessary to accurately measure Delta's real 1975 earnings, and stated:

> For purposes of formulating Delta's year-end financial statements the position which the firm's accountants have taken is very likely correct. (Tr. p. 2.)

Delta, by affidavit and through an opinion letter from its outside accounting firm, had introduced evidence that its own position was consistent with generally accepted accounting principles, and FEA's position contrary to such principles. In their opinion letter (Tr. pp. 88–89) that accounting firm wrote:

> We are not in agreement with the conclusions reached by the Federal Energy Administration or the rationale used to arrive at these conclusions . . . We do not believe that an adjustment to the 1975 pre-tax profit for the change to LIFO is proper or can be justified.

But FEA disagreed with Delta's accountants and adhered to the position that "for the limited purpose of measuring the adequacy of the entitlements exception relief granted to Delta during 1975, it is absolutely essential that Delta's historic operating results and its 1975 operating results be measured on a consistent basis". (FEA Decision, November 5, 1976. Tr. p. 278.) FEA thereupon sought to add-on the additional sum of $1.8 million to Delta's reported 1975 profits, for the purpose of comparing 1975 with its previous years.

The district court concluded that "in light of the opinion letter from Delta's outside independent accounting firm, virtually undisputed in the record, . . . the agency action with regard to the change in inventory valuation was improper and not supported by substantial evidence." (Tr. p. 470.) The court further concluded that FEA, in refusing to accept Delta's change to LIFO for 1975, had acted beyond its statutory and regulatory authority.

The FEA, in Southland Oil Company, petitioner, Case No. FEA 902, 903, December 21, 1976, (Southland I), was confronted with an issue very similar to the one presented here. Southland had changed its accounting methods from FIFO to LIFO in 1974, thus increasing its cost-of-goods-sold by a one-time change in that year. Subsequently, for the purpose of determining its historic profitability during the base period 1968–74 on a consistent basis (the very same argument the FEA now makes here), Southland claimed it should be entitled to measure *actual* 1974 profits by adding back this one-time charge to its reported profits. But the FEA in Southland I refused to permit the add-on, citing its general rule of relying upon a firm's *reported* profits where supported by generally accepted accounting principles. In that Decision and Order, FEA said:

> We do not find Southland's arguments persuasive. Any firm could point to cer-

tain expense items contained in its financial statements and claim that those expenses were unusual and unrepresentative of its normal operations for a variety of reasons. If the FEA were to accept the position advanced by Southland and permit firms to adjust their historical financial results to exclude expenses which they regard as unusual, it is possible that the firm's historical profitability which the FEA uses in evaluating requests for exception relief from the Entitlements Program would bear little resemblance to the firm's actual operating performance during the historical period. Moreover, *if the FEA were to adopt a policy of allowing adjustments to historical financial results to eliminate unusual items*, it would not only be necessary to exclude unusual expenses at the request of small refiners but to omit unusually profitable items as well and to further adjust unusually low expenses. *If this type of policy were adopted, it would be extremely difficult to process exception applications submitted by small refiners from the Entitlements Program in a fair and efficient manner.* As a result of questions which would arise with respect to specific revenue and expense items and the difficulties which would be involved in assessing whether certain items were in fact unusual, *this procedure would unavoidably lead to an arbitrary determination of a firm's historical profitability as opposed to the present general procedure which is based on the use of the firm's own financial statements prepared in accordance with generally accepted accounting principles. Consequently, as a general rule the FEA does not permit adjustments to the level of profit actually reported by a firm for purposes of determining whether exception relief from the Entitlements Program is warranted.* (Emphasis added.)

Southland I, *supra*, at p. 9.

Thus, in determining whether Southland was subject to any recapture of 1975 relief, FEA let Southland measure its profits from 1968 through 1973 on the FIFO basis, for 1974 on the LIFO basis, and for 1975 on the

LIFO basis. They defended this policy on the basis of their efforts to avoid arbitrary determination of a firm's profitability and in line with their announced rule of dependence upon a firm's own financial statements prepared in accordance with generally accepted accounting principles.

In Southland's subsequent appeal (Southland II), Southland Oil Company, FEA No. FEA–1066, April 8, 1977, the FEA restated its general rule and the reasons therefor: "As a general principle, we do not consider it appropriate to allow a firm to restate its historical financial results for purposes of the exceptions analysis to reflect the FIFO method of valuing inventories. As a result of the use of the FIFO method of inventory valuation, a firm is able during an inflationary period to record substantial profits on its financial statements which it would not otherwise realize under the LIFO method of inventory accounting. This situation exists because under the FIFO method the cost of the raw material used in the production process is valued at the lower price at which it was originally purchased rather than at the higher replacement cost. Consequently, *the level of profitability which a firm realizes as a result of its use of the FIFO method of accounting during a temporary period of high inflation does not accurately reflect the actual operating posture of a firm over the longer term.* . . . If Pasco had used the FIFO method of inventory accounting, it would have reported considerably higher profits which would not really have reflected its long-term operating posture and the firm would accordingly have been entitled to additional exception relief as a result of *the inflated profits* which it earned during its historical period. . . . In our judgment, it would not be appropriate to allow Larco to inflate Pasco's historical results by using a FIFO accounting system and thereby obtain additional exception relief." *Little America Refining Co.*, 5 FEA ¶ —— (March 10, 1977) (emphasis supplied).

Southland II, *supra*, at pp. 15–16.

"As set forth in the Little America decision, we do not consider it appropri-

ate to restate Southland's 1974 financial results on a FIFO basis. Accordingly, Southland's request that the FEA exclude the effects of a change in its method of inventory valuation during the historical period must be rejected."

■ We are mindful of the colorable argument made by FEA in support of its attempted $1.8 million add-on, but we deem it of paramount importance that the agency adhere to its own announced rules, that they be applied uniformly, and that the agency be even-handed in its treatment of refiners in the Entitlements Program. If the FEA were to approach each application on an individual basis, with unbridled authority to add-on costs-of-goods-sold or to exclude expenses which they regard as unusual, such "procedure would unavoidably lead to [that] arbitrary determination of a firm's . . . profitability" which the FEA rejected in Southland I in favor of

"the present general procedure which is based on the use of the firm's own financial statements prepared in accordance with generally accepted accounting principles." Southland I, p. 9.

■ The district court did not err in holding that FEA's action in upwardly adjusting Delta's pre-tax income for 1975 to offset the change in inventory valuation from FIFO to LIFO for the purpose of determining final 1975 exception relief was improper and not supported by substantial evidence.

We affirm the judgment of the district court in DC–43.