**TWIN CITY BARGE & TOWING, a corporation, and Ventech Engineers, Inc., a corporation, d/b/a Twin-Tech Oil Company, a partnership, Plaintiffs,**

v.

**James R. SCHLESINGER, Secretary of Energy, Defendant.**

**Civ. A. No. 77–H–1577.**

United States District Court,
S. D. Texas,
Houston Division.

Nov. 13, 1978.

---

Jack R. Bailey, Bailey, Williams & Tubb, Houston, Tex., Richard G. Morgan, Washington D. C., for plaintiffs.

Elizabeth Langer, Dept. of Justice, Washington, D. C., for defendant.

### Memorandum and Order

SINGLETON, District Judge.

The above-styled-and-numbered cause is an action brought to enjoin two orders of the Federal Energy Administration (hereinafter referred to as "FEA")[1] which granted in part and denied in part exception relief requested by plaintiffs from certain FEA pricing regulations. After a hearing before the court, preliminary relief was granted to plaintiffs on December 13, 1977, enjoining the defendant from giving effect to a substantial part of its two orders until a final judgment is entered by the court. As all issues presented to this court pertain to the proper pricing of natural gas liquids (hereinafter referred to as "NGLs") pursuant to the regulations of the FEA, this court has jurisdiction under the provisions of section 5(a)(1) of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 et seq. (1977) (hereinafter referred to as "EPAA"), which incorporates the judicial review provision of the Economic Stabilization Act of 1970, § 211(d)(1), as amended, 12 U.S.C. § 1904 note (Supp.1977). Plaintiffs and defendant have now filed cross-motions for summary judgment, and there being no disputes as to any material fact, these motions are properly before the court for decision.

### HISTORY OF TWIN–TECH OIL COMPANY'S OPERATIONS

Twin-Tech Oil Company (hereinafter referred to as "Twin-Tech") is a Texas partnership comprised of Twin City Barge & Towing (hereinafter referred to as "Twin City") and Ventech Engineers, Inc., a Texas corporation (hereinafter referred to as "Ventech"). The only business in which Twin-Tech has ever been involved is the operation of a single gas processing plant in Garza County, Texas, producing NGLs for sale by Twin-Tech. NGLs are the liquefied hydrocarbons recovered from "wet" natural gas and include ethane, propane, butane, propane-butane mixtures, pentanes, natural gasoline, and condensate.[2] Operation of a typical gas processing plant requires that a stream of natural gas be secured from a producer to be used as feedstock or raw material. Through a fractionation process, NGLs are then separated from the gas stream. Following extraction of the NGLs, the gas processor will then sell the NGLs and, in most instances, the residue gas.

The initial gas plant operations were conducted by Ventech as the sole owner and operator. In December, 1973, Twin City entered into a partnership agreement with Ventech under which Twin City purchased 75 percent of the assets involved in the gas processing operations. Under this agreement, Twin-Tech was formed. A separate agreement between the partners designated Ventech as the manager of the gas plant on behalf of the partnership.

The processing plant is small by industry standards, as it processes casinghead natural gas which totaled only 4,000 barrels per day (hereinafter referred to as "bpd") before gas production began rapidly declining in 1977. Because the plant is small, per unit operating costs and depreciation expenses are higher than in large processing plants. The natural gas processed at the plant is produced by the Sun Oil Company (hereinafter referred to as "Sun") in connection with crude oil (casinghead gas) from Sun's Swenson-Garza Field. The production from this field has declined and is continuing to decline at a rapid rate. This

1. Effective October 1, 1977, the powers and functions of the Federal Energy Administration were transferred to the newly created Department of Energy ("DOE"). See Department of Energy Organization Act. Pub.L. No. 95–91, 91 Stat. 565; Executive Order 12009, 421 Fed.Reg. 46,267 (September 15, 1977). All references to FEA should be considered as references to DOE as well.

2. NGLs are used for residential and commercial heating, refinery feedstock and blending agents, agricultural purposes, and for peak shaving and boiler fuel purposes by utilities.

decline in production results in the corresponding decline in output of Twin-Tech's gas plant. In addition, production at the plant varies seasonally due to weather and pressure variations. The highest production occurs during the second and third quarters of each year; the lowest production occurs in the first and fourth quarters.

Prior to the commencement of actual operations, Ventech negotiated contracts to secure a supply of necessary raw material and to sell the end product (NGLs). As mentioned above, Twin-Tech concluded an agreement with Sun in which Sun agreed to deliver sufficient casinghead natural gas as needed to run the processing plant. In return, Twin-Tech agreed to pay Sun 33⅓ percent of all gross revenue gained from its NGLs sales. An additional payment of about 4 percent of gross revenues is also made to H. C. Lewis, a royalty owner.

In late spring, 1973, Ventech also negotiated an output contract with Skelly Oil Company (hereinafter referred to as "Skelly") for the sale of NGLs from the proposed gas plant. The contract with Skelly was signed on June 13, 1973. Operation of the plant actually began in July, 1973, and production was sold under terms of the contract with Skelly months in advance of FEA's creation.

On July 7, 1974, Skelly was replaced as the output purchaser of NGLs from the Twin-Tech gas plant by Marion Oil Company (hereinafter referred to as "Marion"). Marion's contract price was computed by carrying over the base price paid by Skelly and was increased only to reflect higher product and nonproduct costs incurred by Twin-Tech since commencement of its operations. Marion continues to this day as the sole purchaser of Twin-Tech's NGLs production.

One major feature distinguishing Twin-Tech's operations from the vast majority of other plants is that Twin-Tech has never entered into any contractual agreement for the sale of its residue gas. The isolated location of the Twin-Tech plant and its necessary dependence upon Sun for natural gas precludes Twin-Tech from selling its residue gas.

In the processing of natural gas, only a part of the natural gas is consumed in producing NGLs. As a result, the vast majority of natural gas processors derive revenue through the sale of two distinct energy products: NGLs and residue gas. Although Twin-Tech, like other gas processors, has residue gas, no natural gas pipeline is located close enough to the Garza gas plant to permit the sale or transportation of residual natural gas after processing. If the volume of gas were great enough, a pipeline might build facilities to purchase the residue gas, but during the four peak months of production operations, only about 230 thousand cubic feet (hereinafter referred to as "Mcf") per day would be available for sale. This, coupled with the short remaining life of the production, makes extension of a pipeline to the plant economically unjustifiable. Thus the residue gas cannot be sold.

Prior to the commencement of Twin-Tech's operations, the casinghead gas produced at the Swenson-Garza Field has been vented or flared; therefore, the NGLs were simply never recovered at all prior to construction of Twin-Tech's plant.

Since operations began, the residue gas has been utilized as fuel for the processing plant itself, as injection gas to enhance crude production in the field, and as fuel for Sun's heater-treater facilities in the field. Under the agreement with Sun, Twin-Tech would be obligated to return processed gas at a specific pressure, even if it had no actual NGLs sales. While investment by Twin-Tech was made in 1973 with an awareness of (1) the limited life of the Swenson-Garza Field and (2) the absence of any pipeline for the sale of the residue gas, plaintiffs reasonably expected to earn a sufficient profit from the sale of NGLs to overcome these disincentives to the recovery and use of these energy resources.

## FEDERAL ENERGY ADMINISTRATION REGULATION OF NATURAL GAS LIQUIDS

FEA has authority to regulate the allocation and pricing of crude oil and petroleum

products, including NGLs, pursuant to the EPAA. The history of federal regulation of NGLs and other petroleum products is aptly summarized in *Mobil Oil Corp. v. FEA*, 566 F.2d 87 (Em.App.1977).

The pricing regulations applicable to NGLs (10 C.F.R. § 212.161–171 Subpart K) were promulgated by the FEA in December of 1974 and became effective on January 1, 1975. Prior to that time, the price of NGLs was governed by refiner price regulations (10 C.F.R. § 212.81–89 Subpart E) which applied to gas processors like Twin-Tech as well as petroleum refiners. Defendant points out that a principal reason for not continuing to apply the refiner price rules of Subpart E to gas processors was that the refiner price rules contained no incentive for gas processors who sell natural (residue) gas to recover and market the NGLs contained in that natural gas. *See* 39 Fed.Reg. 32,719 (Sept. 19, 1974). To provide that incentive, Subpart K allows gas processors to use the "cost of natural gas shrinkage" as a component in calculating the allowable selling price of NGLs produced. The cost of shrinkage is basically the amount of revenue which could have been acquired by selling natural gas which is instead processed into NGLs. 10 C.F.R. § 212.162.

Subpart K provides that the maximum price allowed to be charged by a gas processor for NGLs is to be determined as the sum of

1. the base price at which those products were sold by the gas processor on May 15, 1973, or an adjusted base price for propane of 8.5 cents per gallon ("hereinafter referred to as 'cpg'") for butane of 9.0 cpg and for natural gasoline of 10.0 cpg, 10 C.F.R. §§ 212.163(a), 212.164(a);

2. any increased product costs as determined by the shrinkage of the gas stream experienced in the processing of the natural gas, 10 C.F.R. § 212.166; and

3. any increased nonproduct costs incurred up to a maximum of .5 cpg, 10 C.F.R. § 212.165.

Subpart K excludes net back payments such as these made by Twin-Tech Sun from the calculation of increased product costs. 10 C.F.R. § 212.166(d). Subpart K was, by its terms, applicable to sales occurring on January 1, 1975, and after. Through several rulings, the FEA has allowed the Subpart K regulations to be applied retroactively to determine maximum selling prices. *See* 40 Fed.Reg. 23,272 (May 29, 1975) and 40 Fed. Reg. 40,824 (September 4, 1975).

## ADMINISTRATIVE PROCEDURES FOR EXCEPTION RELIEF

Pursuant to congressional directive, FEA created the Office of Exceptions and Appeals as the body to consider applications for exception relief from the regulations in cases of serious hardship, gross inequity, or unfair distribution of regulatory burden. 10 C.F.R. § 205.50. Congress recognized that sudden implementation of industry-wide regulations could impose unequal burdens on some companies. Thus the Office of Exceptions and Appeals was charged with the responsibility to consider specific circumstances affecting individual companies and fashion relief accordingly.

Pursuant to authority grounded in the Federal Energy Administration Act of 1974 (hereinafter referred to as "FEAA"),[3] regulations governing the exceptions process and review standards were promulgated under 10 C.F.R. § 205.50 *et seq.* Under those regulations, requests for exceptions from application of FEA regulations on grounds of serious hardship and gross inequity are considered by the FEA's Office of Exceptions and Appeals. In title 1 of the Energy Conservation and Production Act (hereinafter referred to as "ECPA"),[4] Congress first specifically addressed the issue of exception relief to firms which either were experiencing financial difficulty or were being inequitably or disproportionately affected by application of FEA regulations to their specific operations. Congress was in-

3. Pub.L. No. 93–275, 88 Stat. 96, 15 U.S.C. §§ 761 *et seq.* (1977).

4. Pub.L. No. 94–385, 90 Stat. 1127, 15 U.S.C. § 766 (1977).

tent on making the agency more responsive to public needs and, in that regard, made particular reference to improving the procedures and standards of hardship applicable to exception requests.

As noted in the Senate Report accompanying the ECPA,

the exceptions process is designed in substantial measure to resolve factual situations which could not have been and were not contemplated at the time the general statutory or regulatory programs were adopted.

S.Rep. No. 94–1119, 94th Cong., 2d Sess. 60 (1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 2005, 2037.

Thus section 104 of the ECPA now mandates that FEA

shall provide for the making of such adjustments, consistent with the other purposes of this chapter, as may be necessary to prevent special hardship, inequity, or unfair distribution of the burdens and shall, by rule, establish procedures which are available to any person for the purpose of seeking an interpretation, modification, rescission of, exception to, or exemption from, such rules, regulations, and orders.

15 U.S.C. § 766(b) (Supp.1978) (formerly 15 U.S.C. § 766(i)(1)(D) (1977)). Section 766(b) further requires that FEA establish the criteria and guidelines by which special hardship, inequity, or unfair distribution of burdens are to be evaluated and mandates that each exception decision "shall specify the standards of hardship, inequity, or unfair distribution of burden by which any disposition was made, and the specific application of such standards to the facts . . .."

## PROCEEDINGS BEFORE THE FEDERAL ENERGY ADMINISTRATION BY TWIN–TECH OIL COMPANY

In the summer of 1976, field auditors with FEA advised Twin-Tech that it had possibly sold its NGLs above the maximum lawful price allowable under Subpart K and that it could face an estimated refund liability of $750,000. Thereafter, Twin-Tech applied to the FEA Office of Exceptions and Appeals for prospective and retroactive exception relief. Twin-Tech requested that relief be granted allowing it to (1) utilize its actual contract price with Skelly, under negotiation on May 15, 1973, as its first sale price; (2) include in its maximum price increased product costs, since the formula adopted by FEA could not be applied to Twin-Tech; (3) allow a pass-through of increased nonproduct costs above the .5 cpg limit to reflect depreciation, interest, and AS&G expenses, all cost items necessary to the operation of Twin-Tech; and (4) grant retroactive relief from potential refunds which were so extensive Twin-Tech would have no incentive or capability to continue its operations. In response to requests from FEA, additional information in support of its application for pricing relief was submitted by Twin-Tech on December 30, 1976, March 1, 1977, and March 21, 1977.

In its application for exception relief, Twin-Tech requested the above-mentioned relief on the basis that it could not continue to operate absent such pricing relief. In this connection, Twin-Tech submitted financial statements covering several years of its operations indicating the differences in cash flow, net income, and potential refund liability to Twin-Tech, depending upon whether or not FEA granted its requested pricing relief. Twin-Tech also submitted letters of certain independent public accountants supporting its position on the pass-through of increased depreciation and interest expenses.

On March 28, 1977, FEA issued an order which substantially denied Twin-Tech's requests. FEA refused to recognize Twin-Tech's contract price with Skelly as a proper base price, holding that the lack of actual sales by Twin-Tech on May 15, 1973, was determinative of the issue. Rather, FEA assigned Twin-Tech an adjusted base price of 9.23 cpg computed according to 10 C.F.R. § 212.164. FEA allowed Twin-Tech to add 1.4 cpg of increased nonproduct costs to its adjusted base price (arrived at by using a series of calculations to remove identifiable, nonrecurring, start-up costs from the 1973 cost-per-gallon figure thus increasing the

difference between 1973 and 1976 nonproduct cost-per-gallon figures thus yielding a greater increase in nonproduct costs per gallon over those years) bringing the maximum allowable sales price to 10.63 cpg. FEA refused to allow Twin-Tech to increase its sales price to reflect any increased product costs, concluding that Twin-Tech had no product costs. Finally, FEA disallowed inclusion of depreciation, interest, and AS&G expenses in Twin-Tech's calculation of nonproduct costs and dismissed Twin-Tech's request for retroactive exception relief without prejudice.

On May 13, 1977, Twin-Tech appealed the order and applied for a stay of the order pending a final determination on its appeal. Twin-Tech appealed on the same grounds as presented in its initial application, contending, in addition, that reliance upon the third quarter of 1976 in computing increased nonproduct costs was improper. Twin-Tech supplemented its appeal with financial material for 1976 and 1977 to show the effect of the March 28, 1977, order on cash flow and profit. On May 19, 1977, FEA denied the application for stay filed by Twin-Tech. While Twin-Tech's appeal of the March 28, 1977, order was pending in FEA, Twin-Tech appealed to this court on September 22, 1977, for injunctive relief necessitated by the denial of its stay request.

On September 30, 1977, FEA issued a decision and order relating to Twin-Tech's appeal. In the September 30 order, FEA refused all of the pricing relief requested by Twin-Tech except for an additional allowance of 1.28 cpg. This relief was granted after a determination that the administrative and legal expenses carried on the books of Twin City and Ventech were directly associated with the operation of the gas processing plant and, as a result, were legitimate nonproduct costs. Otherwise, the September 30 order presented few additional reasons for upholding the initial FEA decision and failed to consider the issue of proper quarterly data in computing increased nonproduct costs. As a result of this order, the total allowable price for sales of NGLs by Twin-Tech is now 12.11 cpg, less than half the national average price at which such products are currently being sold.

## REVIEW BY THIS COURT

On September 22, 1977, Twin-Tech filed suit in this court against defendant, asking that the FEA order of March 28, 1977, be enjoined and reversed. After September 30, 1977, Twin-Tech amended its complaint to include FEA's September 30, 1977, order. An oral hearing was held on November 29, 1977, in which all parties participated and testimony was received from officers of Ventech and Twin City.

Following a review of the record and testimony adduced at that hearing, this court issued a Memorandum and Order on December 13, 1977, enjoining and restraining FEA from enforcing its March 28 and September 30 orders insofar as those orders

1. restrict Twin-Tech from including an imputed shrinkage adjustment in its allowable price to reflect increased product costs incurred by Twin-Tech;

2. restrict Twin-Tech from including increased depreciation expenses incurred by Twin-Tech in its allowable price; and

3. restrict Twin-Tech from utilizing the most recent financial data available in determining all product and nonproduct costs increases.

The court found it unnecessary to consider the remainder of issues presented by Twin-Tech in its Amended Complaint at that time, but will reach all issues in deciding the cross-motions for summary judgment now before it.

The EPAA adopted as the standards for review of FEA orders those articulated in the Economic Stabilization Act of 1970, *supra.* Section 211(d)(1) of the Economic Stabilization Act requires that "no order of such agency shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence." One standard to be applied in reviewing the FEA orders is thus

whether such orders are consistent with the mandate given the FEA in its enabling statutes.

"The authority of an administrative agency is delineated by the terms of the statutory grant. The responsibility for construing the statutory authority rests with the judiciary. Hence, an inquiry to determine if the agency has exceeded its statutory power is a constitutional obligation of the courts. The refusal to apply the agency ruling upon finding that the bounds laid down by Congress have been traversed is not based on evidentiary insufficiency or disagreement with expert judgment, but is an exercise of judicial authority to preserve the legislative scheme." *Elgin, Joliet & Eastern R. R. Co. v. Benj. Harris & Co.,* N.D.Ill.1965, 245 F.Supp. 467, 472.

*Board of Public Instruction of Taylor County, Fla. v. Finch,* 414 F.2d 1068 (5th Cir. 1969).

The other applicable test, that of determining whether an administrative order is supported by substantial evidence, has also been defined by the courts. The Supreme Court has defined "substantial evidence" to be:

[E]vidence . . . affording a substantial basis of fact from which the fact in issue can be reasonably inferred . . . must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.

*NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939).

The Temporary Emergency Court of Appeals has held in connection with judicial review of FEA determinations that, within the confines of the "excess of agency authority" and "substantial evidence" tests of section 211(d)(1) of the Economic Stabilization Act, FEA's decisions are entitled to great deference due to recognized agency expertise. This "great deference rule" applies to FEA decisions as well as FEA interpretations of its enabling statutes and regulations. *Pasco, Inc. v. FEA,* 525 F.2d 1391 (Em.App.1975). However, the deference the court will give to the FEA in reviewing its March 28, 1977, and September 30, 1977, orders is subject to the requirement that the agency fully explain and justify its decisions in the orders it makes.

[The agency] shall additionally insure that each decision on any application or petition requesting an adjustment shall specify the standards of hardship, inequity, or unfair distribution of burden by which any disposition was made, and the specific application of such standards to the facts contained in any such application or petition.

15 U.S.C. § 766(b) (Supp.1978). Therefore, the FEA orders in question may only be upheld if they are sustainable by what is said in the orders themselves. *NLRB v. Metropolitan Life Insurance Co.,* 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965).

## OPINION

The cross-motions for summary judgment ask the court to determine whether or not the FEA orders of March 28, 1977, and September 30, 1977, are within the FEA's authority and are supported by substantial evidence. Those orders denied, in most respects, the plaintiffs' contentions that the applicable price regulations, set forth in Subpart K of Title 10, C.F.R., Part 212, caused serious hardship and gross inequity as applied to them. For purposes of deciding whether or not the FEA's rejection of plaintiff's contentions are within its statutory authority and supported by substantial evidence, the court has analyzed the FEA orders and the evidence before the agency on three levels. First, the court will examine the FEA's denial of each of plaintiffs' specific exception requests to determine whether the FEA's decision not to grant exception relief from a particular section of the Subpart K price regulations is sustainable. Secondly, the court will examine the FEA's denial of plaintiffs' contention that the impact of the price regulations as a whole results in serious hardship or gross inequity. Thirdly, the court will review the FEA's decision to dismiss without prejudice

plaintiffs' request for retroactive exception relief.

## I. Specific Exception Requests

### A. Use of Actual Contract Price with Skelly as First Sale Price

In its Application for Exception Relief, Twin-Tech requested that it be permitted to use its first actual sale price of 11.64 cpg as the base price for purposes of Subpart K regulations.

The base period price is the starting point at which a company must begin in computing its maximum allowable price under the FEA regulations. Subpart K specifies four possible alternatives for use as a base price:

1. under the general rule as a gas processor having NGLs sales on May 15, 1973, could adopt *its actual May 15, 1973,* price as the base price, 10 C.F.R. § 212.163(a);

2. a gas processor with sales on May 15, 1973, could use an *adjusted base price* using the weighted average prices of 8.5 cpg for propane, 9 cpg for butane and 10 cpg for natural gasoline, 10 C.F.R. § 212.164(b);

3. a gas processor commencing sales after May 15, 1973, could use the *New Item Rule* by adopting the price on its first day of sales at which NGLs were sold by another processor or refiner on that same date, 10 C.F.R. § 212.-111(b)(1)(ii); or

4. a gas processor having construction or expenditures for such construction after January 1, 1975, is allowed to take a specified higher price as its base price, 10 C.F.R. § 212.164(c)–(e).

The March 28 order concluded that Twin-Tech had only two options for determining a base price for its sales: (1) application of the New Item Rule (the third pricing option outlined above) or (2) calculation of an adjusted base price using the weighted average price for NGLs components (the second option). Twin-Tech requested that it be permitted to use Ventech's actual first sale price of 11.64 cpg. Because it was a new company, Twin-Tech had no actual sales on

May 15, 1973. However, since early 1973, Ventech, a partner in Twin-Tech and its gas plant manager, had been involved in substantial planning and preparation for the plant's opening. Although not yet engaged in actual operations on May 15, 1973, it was deeply involved at that time in the final stages of negotiation in its first contract with Skelly. Less than one month later, on June 13, 1973, that contract was signed and operations were begun shortly thereafter. In December of 1973, Ventech and Twin City entered into the partnership under which Twin-Tech was formed. FEA determined that Twin-Tech was not entitled to use its actual first sale price (option 1, above) because the first sale did not occur until after May 15, 1973. Further, FEA concluded that Twin-Tech was not entitled to exception relief in this regard.

> [T]he firm has not provided any material which would indicate that it is experiencing a serious hardship or gross inequity as a result of the manner in which it is required to determine its first sale prices for NGLs under the general FEA regulatory program.

FEA Order of March 28, 1977, at 9. On Appeal, FEA maintained this position and observed that

> Twin-Tech has not presented any material in its Application for Exception or in its appeal which indicates that the application to the firm of the provisions of 10 C.F.R. § 212.111(b) [the New Item Rule] places the Twin-Tech firm in a substantially different position from other similarly situated firms.

FEA Order of September 30, 1977, at 12. The application of the New Item Rule to Twin-Tech causes its base price to be set at 9.23 cpg, about 2 cpg lower than its actual first sale price of 11.64 cpg.

Twin-Tech argued in its Application for Exception and on Appeal that it was inequitable to apply the New Item Rule when plaintiffs missed the May 15, 1973, deadline by only a month. Twin-Tech also urged that it was inequitable under the New Item Rule to impute another processor's prices to it when such processor might have a differ-

ent capital structure or scale of operations. Finally, Twin-Tech contended the pricing regulations were causing them serious financial hardship, and that allowing plaintiffs the use of their first sale price as the base price would reduce that hardship.

█ The court finds, with one reservation, that FEA did not err with regard to its statutory authority or the evidence presented by rejecting Twin-Tech's arguments for use of its first sale price as a base price. As defendant pointed out, the use of a uniform base period date was an important congressional concern in enacting the Emergency Petroleum Allocation Act. The court's only reservation with the FEA on this issue concerns the question of whether the price regulations as a whole (of which the New Item Rule is only a part) caused serious hardship or gross inequity as applied to Twin-Tech.

### B. Inclusion of Increased Product Costs

In its initial Application for Exception Relief, Twin-Tech petitioned to include an imputed shrinkage cost in its allowable price to reflect its product costs. The Office of Exceptions and Appeals denied the request on March 28, 1977, finding that "Twin-Tech does not actually incur any increased costs of natural gas shrinkage because it does not sell its residual natural gas." That conclusion was reiterated on September 30, 1977, by FEA upon appeal. Based on the explanation of the "cost of natural gas shrinkage" and of the rationale of the FEA in allowing the increased cost of shrinkage as a component in the calculation of maximum NGLs price (*supra* at 642 and 643), the court finds (subject to the same reservation discussed above with respect to the first sale price issue) that the FEA decision not to allow Twin-Tech an imputed shrinkage cost in its allowable price was entirely within its statutory authority and supported by the evidence. Twin-Tech simply has no shrinkage cost, and therefore no increased cost of shrinkage as those terms are defined, because it sells no natural (residue) gas.

Twin-Tech argues in the alternative that if it is not permitted to reflect its product cost by an imputed shrinkage cost, it should be permitted to treat the net-back royalty payment to Sun as a product cost. In the court's order of December 13, 1977, granting a preliminary injunction in favor of Twin-Tech, the court concluded that plaintiffs have product costs which have been disallowed by FEA. What the court had in mind was that the net-back payments represent in essence the cost to Twin-Tech of the raw material (casinghead gas) from which NGLs are processed. This cost did not appear to the court to be recognized by the Subpart K price regulations, especially because 10 C.F.R. § 212.166(d) excludes net-back payments from the calculation of increased product costs. However, the Government argues and the court agrees that the issue is not whether FEA has disallowed all *product costs* but, rather, whether FEA has disallowed *increased product costs*, because "[Plaintiffs' initial product] cost is included in the historical base period price from which *increased* product costs are calculated." Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, at 46 n. 43. Therefore, the court's concern that plaintiffs' royalty cost was not recognized was unfounded.[5] And although plaintiffs strenuously argue to the court that the pricing regulations do not allow for adjustment of NGLs sales price to reflect *increases* in the dollar amount of royalty payments, they did not make this argument to FEA in their initial Application for Exception Relief or on appeal. The court will return to plaintiffs' argument later in this opinion,[6] but it will not consider it as a ground for overturning FEA's decision disallowing an imputed

---

5. However, the court realizes that because plaintiffs' historical base period price is an assigned price of 9.23 cpg, plaintiffs' initial royalty cost is not recognized as accurately as it would be if plaintiffs' historical base price were its actual first sale price of 11.64 cpg.

6. See *infra* pp. 654–655 of this opinion.

shrinkage cost to plaintiffs. Therefore, the court finds the FEA decision not to allow Twin-Tech to include an imputed shrinkage cost in its price calculations to be sustainable, while reserving the question of whether or not the impact of the price regulations as a whole results in serious hardship on gross inequity.

C. Pass-through of Increased Nonproduct Costs

1. Depreciation

In both its Application for Exception Relief and subsequent appeal, Twin-Tech requested approval of FEA to pass through depreciation expenses. Twin-Tech asserted that failure of FEA to allow depreciation expenses in Twin-Tech's pricing was arbitrary, capricious, and erroneous as a matter of law in light of FEA's allowance of depreciation as a legitimate nonproduct cost item to crude oil refiners and resellers. Data was submitted showing that depreciation costs during 1976 ranged from 2.57 cpg to 3.52 cpg.

The principal case relied upon by FEA in denying relief as to depreciation expense was *John H. Cathey*, 4 FEA ¶ 80,562 (October 13, 1976). FEA cited the following as being determinative of the issue:

> Depreciation and depletion . . . are noncash expenses which do not generally affect a firm's incentive to continue production. Despite a firm's book entries for depreciation or depletion, where its actual revenues exceed its operating costs the firm will, in all likelihood, continue operations, and will use the resulting cash flow to recoup a portion of its capital investment. In fact, since depreciation may generally be regarded as an expense for tax purposes, the possibility of using depreciation and depletion expenses under these circumstances will actually *increase* the after tax cash flow to the firm by an amount equivalent to the magnitude of the depreciation and/or depletion expense times the firm's tax rate.

FEA Order of September 30, 1977, at 5–6, citing *John H. Cathey, supra* (citations omitted). FEA's response in its September 30 order to plaintiffs' contention that allowance of depreciation costs to refiners and resellers should warrant similar treatment for Twin-Tech was the following statement: "[R]egulatory standards . . . applicable to one segment of the petroleum industry are not . . . automatically applicable to other segments . . . ." FEA Order of September 30, 1977, at 5.

■ In its order of December 13, 1977, granting preliminary relief, the court stated at 9–10 that "while agency action may be discriminatory, it cannot be arbitrary and that, from the evidence adduced thus far herein, the FEA disallowance of Twin-Tech's depreciation cost [increase] pass-through may be unlawful." After careful consideration of defendant's brief on this issue and reconsideration of the FEA orders and decisions cited therein, the court finds a lack of any adequate explanation for the discriminatory treatment in question. In *Mustang Fuel Corporation*, FEE–3971 (decided July 15, 1977) (unreported decision), FEA was faced with Mustang's contention that "since no basic difference exists between depreciation cost increases incurred by a natural gas processor and a crude oil refiner, the firm should be granted exception relief . . . ."; and FEA's response was identical to that given in Twin-Tech's case:

> The considerations which led the FEA to exclude depreciation expenses in calculating the level of increased costs incurred in the operation of a gas plant would not appear to be significantly affected by the fact that the price regulations applicable to crude oil refiners have been amended to permit the pass through of increased depreciation expenses.

*Mustang, supra* at 6. The court notes that the Department of Energy has released new regulations, effective November 1, 1978, which would permit pass-through of increased depreciation expenses of gas processors (*see* 42 Fed.Reg. 184 (1978)), but this fact is not particularly relevant to the issue of whether FEA has any rational basis for the past and present discrimination in question. Finding that none has been given, the

court will hold FEA's decision to disallow pass-through of increased depreciation expenses of Twin-Tech to be arbitrary and remand this case to the agency for further proceedings on this issue. Subject to the same reservation the court has discussed with respect to other specific exception requests, the court finds that (absent this unexplained discrimination) FEA can, consistent with its statutory authority and the evidence presented, disallow depreciation cost increases on the basis that such increased costs are noncash expenses which do not generally affect a firm's incentive to continue production.

### 2. Interest

■ FEA rejected Twin-Tech's request to include interest expense as a nonproduct cost in determining its allowable NGLs selling price. The interest which Twin-Tech requests permission to pass through in calculating its selling price is that incurred as a result of the $500,000 loan which Twin City obtained in order to purchase its 75 percent interest ownership in Twin-Tech. That loan was fully secured by the property and credit of Twin City. Under the terms of the partnership agreement, Twin City in turn received all profits from the Garza facility until cumulative distributions totaled $500,000. This figure was reached in mid-1975, at which time Twin City and Ventech commenced sharing in the profits and losses according to their respective ownership interests.

Twin-Tech's request to recover this interest expense in its NGLs pricing was dismissed by FEA with the statement that "[t]his interest expense does not arise from the actual operation of the . . . plant, but . . . instead from a change in the ownership status . . . ." FEA Order of September 30, 1977. Therefore, FEA concluded the interest expense does not represent the type of operating cost item justifying exception relief.

Before the FEA Twin-Tech argued that because interest expense in general is a cognizable type of operating cost, Twin-Tech should be allowed to recognize the interest on a loan taken out by its 75 per-

cent interest partner since the proceeds of such loan were used solely to finance the purchase of plant and equipment representing that interest. The court finds that FEA's decision to disallow this interest expense is arbitrary and not supported by substantial evidence, particularly insofar as it disregards the opinions submitted with Twin-Tech's Application for Exception Relief of certified public accountants. These accountants stated that because Twin-Tech leases a major portion of its facilities from its partners for one dollar per year, the interest expense incurred in connection with the purchase of such facilities must be included as an actual economic cost of Twin-Tech's operations.

## II. Serious Hardship and Gross Inequity Contention

Before the FEA, in addition to making the specific exception requests discussed above, Twin-Tech contended that the pricing regulations resulted in serious hardship and gross inequity as applied to it, in that the maximum permissible sale price for its NGLs was insufficient to generate positive cash flow and net profit, insufficient to allow it to recover its investment, and insufficient to provide the necessary incentive for it to continue to operate.

In their initial Application for Exception Relief, Twin-Tech submitted pro forma calculations of profit and loss for 1976 assuming an NGLs sale price of 11.64 cpg (only .5 cpg less than the 12.11 cpg ultimately set by FEA after appeal), which sale price resulted in a net revenue without subtracting depreciation, interest, of AS&G of about $20,428; an after tax loss of $105,332; and a cash flow of negative $17,572. (Pursuant to FEA's request in December of 1976, Twin-Tech submitted additional information for purposes of their initial exception application relative to product and nonproduct costs.)

A discussion of Twin-Tech's 1976 pro forma calculations does not appear in the March 23, 1977, order. Rather, FEA rejected Twin-Tech's contention that it would not

earn a net profit, generate positive cash flow, recover its investment, or have the incentive to continue operations at the FEA imposed selling price with the following paragraph:

> Furthermore, in view of the exception relief granted in this Order permitting Twin-Tech to pass through its increased non-product costs, the firm's contention that it has no economic incentive to continue operations at its gas processing plant is no longer valid. The data which Twin-Tech has submitted indicates that with the non-product cost pass through of $.0140 per gallon, the firm's weighted average unit selling price is $10.63,[3] the
>
> [3] This figure is based on a weighted average price using Subpart K adjusted prices for NGLs of $.0923 as calculated by Twin-Tech in Exhibit E of its exception submission, plus the $.0140 per gallon non-product cost pass through granted in this Decision.
>
> data further indicates that the firm's unit cost is approximately $.0973[4] which re-
>
> [4] This figure is calculated by dividing the non-product costs in the third fiscal quarter of 1976, $45,176 by the volume of production which is attributable to Twin-Tech's interest, 62.31% (the revenue from the remaining 37.69% of production from the plant is paid to Sun and H. C. Lewis as "net back" and royalties).
>
> sults in a margin of $.0090. Under these circumstances Twin-Tech does have an incentive to continue the operations at its plant and exception relief on the grounds of serious hardship would be inappropriate.

FEA Order of March 28, 1977, at 7–8. The third-quarter-production figure of 744,744 gallons does not appear in the exhibits submitted by Twin-Tech to FEA for purposes of Twin-Tech's initial exception application, but all counsel have agreed that it is correct.

In its appeal of FEA's March 28, 1977, order, Twin-Tech disputed the FEA's finding that it would have an incentive to continue operations. First, Twin-Tech argued that if it had charged the price sanctioned by that order over the four-quarter period 4/1/76–3/31/77, it would fail to recover the operating expenses sanctioned by that order by more than $45,000. Secondly, Twin-Tech

demonstrated that at the price sanctioned by that order, it would sustain a net loss of over $200,000, and a negative cash flow of about $115,000 over the same four-quarter period, when interest, depreciation, and AS&G expenses were taken into account. The thrust of Twin-Tech's argument was that FEA's analysis of Twin-Tech's financial situation based only on the third quarter of 1976 (in which production was higher than that of other quarters due to warm weather and probably higher than it ever will be again due to the fact of rapidly declining reserves) was arbitrary, unrepresentative of actual operations, and unnecessary in that Twin-Tech had made available financial information covering a greater span of time. Furthermore, Twin-Tech challenged the use of 1976 third-quarter data on the ground that the minimal price increases granted in the March 28, 1977, and September 30, 1977, orders based on such data take effect only after March 28, 1977; thus, FEA granted minimal price relief based on an unrepresentatively productive quarter for use in future quarters in which the firm's unit costs would be substantially higher. Twin-Tech reemphasized the point raised in its initial Application for Exception Relief that it operates under circumstances of fairly stable operating costs, highly variable seasonal production volumes (roughly speaking, production volume in winter is one-half of that in summer), and rapidly declining reserves (which decline is expected to cause production volume in each year to amount to roughly two-thirds of the volume of the preceding year, according to the report of an independent geologist submitted to FEA). Therefore, on appeal in addition to urging FEA to reverse its position in the March 28, 1977, order insofar as it denied Twin-Tech the specific relief requested, Twin-Tech asked FEA to calculate the dollar amount of whatever relief FEA was willing to grant on the basis of the most recently completed fiscal quarter (which was the first quarter of 1977 at the time Twin-Tech's brief on appeal was submitted). While the appeal was pending and after Twin-Tech's brief on appeal had been submitted, Twin-Tech completed oper-

ations for the second quarter of 1977 and submitted data to FEA which revealed that the volume of production for that warm quarter was only 441,630 gallons (compared with 770,952 gallons in the second quarter of 1976). Explaining that under the FEA-imposed selling price the firm would fail to recover the FEA-sanctioned expenses by $35,000 and would sustain a negative cash flow of $50,000 and a net loss of $71,000 when depreciation, interest, and AS&G expenses were included, Twin-Tech again urged FEA to calculate relief on the basis of a more representative quarter.

In its September 30, 1977, order, FEA completely ignored the issue of whether its reliance on third-quarter, 1977, data was proper, and apparently relied on the finding in its March 28, 1977, order that Twin-Tech would have an incentive to continue operations based on a .0090 cent-per-gallon profit margin that FEA arrived at by use of third-quarter, 1976, data (see pages 650 and 651 of this opinion).

Before this court defendant argues that the calculation of exception relief based on data from the most recently completed fiscal quarter is the normal procedure and that under Powerine v. FEA, 536 F.2d 378 (Em.App.1976), the FEA will consider new financial information on appeal only if the appellant shows that the "financial circumstances of the firm have changed so substantially since the filing of the exception application that its actual continued economic viability and existence is threatened by" the FEA regulations. Powerine, supra at 384. Finally, defendant argues that FEA's failure to mention this rule in its September 30, 1977, decision on appeal was not improper.

■ Upon careful consideration of the evidence presented to FEA on appeal, the court finds that it was not justified in disregarding Twin-Tech's contention that third-quarter, 1976, data was unrepresentative and in disregarding Twin-Tech's request that exception relief be calculated on the basis of new financial information from later fiscal quarters. In the court's view, the new financial information submitted on ap-

peal (data from the fourth quarter of 1976 and the first and second quarters of 1977) arguably satisfies the Powerine test of irreparable injury and substantially charged circumstances. Possibly, the most compelling evidence under Powerine is the fact of the low volume of production achieved for the second quarter of 1977, indicating that the Garza field reserves were being depleted at a rapid rate and sooner than the geologists had predicted. Taken in conjunction with the affidavits Twin-Tech submitted to FEA stating that at regulated prices Twin-Tech could not afford to stay in operation, the evidence concerning second-quarter, 1977, production arguably satisfies the Powerine test such that FEA should have reached the merits of Twin-Tech's contentions concerning third-quarter, 1976, data and should have considered the new financial data submitted on appeal in connection with such contentions; or FEA should have explained why such evidence did not warrant the consideration of new financial data. In its September 30, 1977, order, FEA fails to "specify the standards . . . by which . . . disposition [of Twin-Tech's contention concerning third-quarter, 1976, data] was made," and fails to make "a specific application of such standards to the facts . . . .." as required by 15 U.S.C. § 766(b) (Supp.1978). In Powerine Oil Co., 3 FEA ¶ 80,537, the FEA fully discussed the import of the new information submitted on appeal in that case and explained why such information did not compel any change in its ruling on Powerine's initial exception application, and FEA should be required to go this far in this case.

■ While the court deems it necessary to remand this cause to the agency because of deficiencies in FEA's disposition of Twin-Tech's contentions with respect to depreciation and interest and Twin-Tech's submission of new financial information on appeal, the court finds that a remand is also required with respect to the reservation discussed earlier in this opinion. In consideration of all of the facts and circumstances presented to FEA (just in Twin-Tech's ini-

tial exception application) concerning the peculiarities of Twin-Tech's situation as a gas processor, the court believes that FEA's rejection of Twin-Tech's contention that the application of price regulations would cause it serious hardship and gross inequity exceeds FEA's statutory authority and is not supported by substantial evidence.

The FEA has been given wide latitude in administering a system of price regulations pertaining to NGLs in order to attempt to serve the often divergent goals of promotion of price stability, fostering of free enterprise and open competition, prevention of unreasonable profits, minimization of hardship and inequity, protection against energy shortages, and preservation of the competitive viability of small firm producers. 15 U.S.C. §§ 751, 753, 761, and 764. One underlying concern of Congress implicit in several of these goals is that pricing mechanisms "permit adequate compensation to assure that private property is not implicitly confiscated by the government." Another is "providing adequate inducement for the production of an adequate supply of the product [while] holding down spiraling consumer costs." Conf.Rep. No. 93–628, 93rd Cong., 1st Sess. (1973), *reprinted in* [1973] U.S.Code Cong. & Admin.News, pp. 2688, 2703.

The court finds that in allowing Twin-Tech to charge only 12.11 cpg for NGLs and in not granting greater relief to Twin-Tech based on serious hardship and gross inequity, FEA exceeded its statutory authority. Twin-Tech's pro forma calculations for 1976 clearly showed that at Subpart K prices, Twin-Tech would fail to make a profit or even generate positive cash flow. Furthermore, Twin-Tech demonstrated that at such prices it would fail to recover its capital investment or have an incentive to continue operations. Under these circumstances, the FEA, by its March and September, 1977, orders has failed to obey the mandate of 15 U.S.C. § 766(b) (Supp.1978), commanding the making of adjustments to prevent hardship and inequity and has failed to heed the above-mentioned statutory goals relating minimization of hardship and inequity and preservation of the viability of small producers.

■ A substantial factor contributing to this situation is FEA's refusal to allow pass-through of increased depreciation costs. The court believes that a temporary limitation on pass-through of increased depreciation costs is warranted based on FEA's reasoning in *John H. Cathey, supra,* but the FEA may not, consistent with the above-mentioned statutory objectives and concerns evidenced in the legislative history, deny recovery of a firm's capital investment over the life of the enterprise. Given the undisputedly short remaining life of Twin-Tech's plant due to declining reserves, the court believes that FEA must allow Twin-Tech to pass through increased depreciation expenses to enable it to recover its investment over the remaining life of the plant.

FEA's finding that Twin-Tech would not suffer serious hardship and gross inequity at Subpart K prices, which finding was based on calculations using third-quarter, 1976, data, is not supported by substantial evidence. First, such calculations did not take into account depreciation, interest, or AS&G expenses; secondly, by using the third-quarter, 1976, production volume, such calculations used an unrepresentative unit cost figure; and thirdly, such calculations failed to account for the predicted decline in production volume due to declining reserves. The court has already indicated that depreciation and interest costs must be considered, and the FEA allowed pass-through of AS&G expenses after appeal. To obtain a representative unit cost figure, the evidence clearly pointed to the necessity of considering a four-quarter period over which Twin-Tech's volume of production would rise and fall with the change of seasons. The court recognizes that FEA's standard procedure for allowance of *non-product* cost increases calls for analysis of cost figures from the most recently completed fiscal quarter, *Superior Oil Co.,* 2 FEA ¶ 83,271 (August 29, 1975); however, by applying this most-recent-quarter analysis to Twin-Tech's contention of serious hardship and gross inequity, FEA failed to come to grips with the issue and disregard-

ed most of the financial evidence submitted to it. Considering all the evidence and financial information concerning Twin-Tech's operations, the firm will suffer serious hardship in terms of all measurements of financial viability by virtue of the FEA's regulations, and the court finds no substantial evidence to the contrary.

The court notes that the FEA-imposed NGLs selling price of 12.11 cpg is the product of several separate regulations contained in Subpart K including the New Item Rule and section 212.166(d)'s prohibition on consideration of royalty payments as costs and the product of several FEA rulings including those disallowing depreciation and interest expenses and failing to consider other than third-quarter, 1976, data. The cumulative effect of these regulations and rulings will cause Twin-Tech to suffer serious hardship and gross inequity. Except for those specific errors heretofore noted, the court does not intend to tell FEA how to fashion exception relief (*i. e.* whether to adjust Twin-Tech's 1973 base price or to allow imputed shrinkage cost increases or otherwise) to alleviate such hardship and inequity but does say that FEA erred in concluding that hardship and inequity did not exist. The court believes that the specifics of fashioning further exception relief consistent with this opinion are best left to the agency on remand, but the court finds that to alleviate the serious hardship and inequity that will otherwise occur under FEA's regulations, such further relief must necessarily allow Twin-Tech to charge a price that will generate positive cash flow and a net profit and enable the firm to recover its investment.

Before concluding this part of this opinion, the court makes the following additional comments and observations. First, the defendant in its briefs to this court has contended that Twin-Tech's financial difficulties are not caused by FEA regulations. Although this contention was not made a basis of the FEA orders in question, the court feels obliged to state that the evidence is to the contrary. All plaintiff entities have exercised reasonable business judgment in the formation and operation of the gas plant now run by Twin-Tech, and plaintiffs reasonably expected to earn a sufficient return to sustain that operation profitably before federal regulation began in 1975.

Secondly, the court notes that the FEA's treatment of royalty payments in conjunction with cost pass-through calculations appears to be financially unrealistic. The problem in this regard is explained in plaintiffs' brief at note 49:

Under the Sun Oil Company contract, Sun has the right to 33⅓ percent of the revenue of NGL sales or can take in kind 33⅓ percent of Twin-Tech's NGL production. By refusing to consider this payment in measuring Twin-Tech's cost, FEA has apparently determined that payments made under this contract are unrelated to Twin-Tech's operations. If this were so, then logically Twin-Tech's total production, in measuring its non-product costs, should be reduced by one-third. Yet FEA calculated Twin-Tech's non-product costs based on 100 percent of plant NGL output. The result is a low per-gallon non-product cost calculation which formed the basis of the negligible non-product cost relief granted in the FEA orders. Thus, Twin-Tech finds itself in the worst of all possible worlds due to FEA's refusal to recognize that Twin-Tech's payments to Sun Oil Company actually *exist*!

Plaintiffs' Memorandum in Support of Motion for Summary Judgment, at 52. It appears impractical under Subpart K to consider increases in the dollar amount of royalty payments as a cost to be passed through because raising the maximum selling price to reflect an increase in the dollar amount of royalty payments would cause a further increase in the dollar amount of royalty payments justifying a further increase in selling price, and so on. The alternative—of calculating unit costs on the basis of the volume of production attributable to the gas processor's percentage interest of total production volume—takes realistic account of royalty payments and produces a more representative unit cost fig-

ure. The court notes that for purposes of nonproduct cost pass-through, FEA arrives at unit costs by dividing total costs by *total* production, but in dealing with Twin-Tech's contention of serious hardship, FEA, in its March 28, 1977, order at 7 and 8, calculated Twin-Tech's unit cost by dividing total costs by its *percentage* of total production. The court does not find any error with respect to this issue of proper treatment of royalty payments, because of the failure of Twin-Tech to directly raise it before the agency but does order that it be considered on remand.

### III. *Retroactive Exception Relief*

Besides requesting prospective exception relief (applying to NGLs sales on and after March 28, 1977, the date of FEA's order disposing of Twin-Tech's application for exception relief), Twin-Tech requested retroactive exception relief (applying to NGLs sales prior to March 28, 1977) from potential refund liability for past NGLs sales in excess of Subpart K allowable prices.

Twin-Tech's request for retroactive exception relief was made because FEA field auditors in 1976 and again in 1977 indicated that Twin-Tech *may* have exceeded allowable sales prices for NGLs by $750,000 or more. Twin-Tech explained to FEA that it would suffer hardship and irreparable injury if it were ordered to refund such overcharges, referred FEA to its *pro forma* statements for 1973–1975, pointed out that a refund of $750,000 would exceed the entire cash generation of the plant through mid-1976 by $300,000, and demonstrated that due to the short life span of the plant, it could not pay such a refund amount even if all requested prospective relief were granted. In its March 28, 1977, order, FEA dismissed Twin-Tech's request without prejudice because the potential refund amount "arose out of a preliminary FEA audit and is subject to further review and to possible revision by the FEA prior to the issuance of any Notice of Probable Violation (NOPV)." FEA Order of March 28, 1977, at 9.

On appeal to FEA Twin-Tech argued that the nonprejudicial dismissal of the retroactive relief request was improper because the issues involved were not factual, but rather purely legal, and were the same ones that had been resolved by the FEA's own March 28, 1977, order, such that the magnitude of refund liability could be calculated with fair certainty to be in the neighborhood of $750,000. Twin-Tech reasserted that a refund liability of such magnitude would cause exceptional hardship and irreparable injury to it, given that such liability would substantially exceed Twin-Tech's total cash flow through mid-1976.

In its September 30, 1977, order, FEA affirmed itself on the retroactive relief issue by reiterating that the FEA auditors' opinions do not represent a formal determination of overcharges and concluding that the issue would not be ripe until a NOPV was issued.

After careful consideration of the foregoing material and the parties' briefs on this issue, the court finds that FEA erred in not reaching the merits of Twin-Tech's request for retroactive exception relief. All the evidence indicates that the magnitude of potential refund liability can be calculated with reasonable certainty. While the court is of the opinion that Twin-Tech is entitled to relief from having to refund overcharges of $750,000 or more, the court will not rule on the merits of Twin-Tech's request for retroactive exception relief since it was not vented before the agency. The court only finds that FEA's perfunctory dismissal of this issue based on lack of certainty is not supported by substantial evidence. On remand FEA must either reach the merits of this issue or provide a rational basis for its failure to do so.

### CONCLUSION

Based on the foregoing opinion, it is ORDERED that plaintiffs' motion for summary judgment and defendant's motion for summary judgment be, and the same are hereby GRANTED in part and DENIED in part, as set forth in this Memorandum and Order.

It is further ORDERED that this cause be remanded to the Department of Energy

**656**

for further proceedings in conformity with this Memorandum and Order.

With respect to such proceedings on remand, it is ORDERED that defendant, James R. Schlesinger, his agents, and all persons and/or entities acting in concert or participation with defendant be, and the same are hereby, REQUIRED:

(1) to reopen plaintiffs' request for exception relief;

(2) to permit such prospective relief as is necessary to enable plaintiffs to maintain the competitive viability of their gas processing operation with respect to positive cash flow, net profit and recovery of capital investment;

(3) to address the issue of the proper treatment of royalty payments in conjunction with cost pass-through calculations and exception relief;

(4) to consider the new (post-third quarter 1976) financial data submitted by Twin-Tech in conjunction with cost pass-through calculations and exception relief;

(5) to allow pass-through of the interest expense incurred by Twin City as a result of the $500,000 loan which Twin City obtained in order to purchase its 75 percent interest ownership in Twin-Tech;

(6) to allow pass-through of the increased depreciation expenses incurred by plaintiffs in connection with the gas plant operation; and

(7) to reach the merits of Twin-Tech's request for retroactive exception relief.

It is further ORDERED that defendant be, and the same is hereby, ENJOINED and RESTRAINED from giving force or effect to defendant's orders dated March 28, 1977, and September 30, 1977.